Chad Mark Franco Ferrari, Pro Se
1119 Wallace Street, 1st Floor
Philadelphia, PA 19123
chadferrari@me.com

March 23, 2026

Office of the Clerk
United States District Court
Eastern District of Pennsylvania
601 Market Street, Room 2609
Philadelphia, PA 19106

REC'D MAR 2 3 2026

Re:   **Ferrari v. Leonard et al. — Track 2 Federal Civil Rights Complaint**
      42 U.S.C. § 1983 — New Action for Filing

Dear Clerk of Court:

Enclosed for filing please find the following documents in connection with the above-referenced new
civil action:

1.  Civil Complaint — Ferrari v. Leonard et al. (Track 2 of 5, 73 paragraphs, 8 counts)
2.  JS-44 Civil Cover Sheet
3.  Exhibit Binders — Tier A, Tier B, Tier C (tabbed and indexed)
4.  Filing fee of $405.00 (or IFP Motion if applicable)

This action arises under 42 U.S.C. § 1983 and concerns alleged retaliatory enforcement, warrantless
phone search, Brady suppression, and related constitutional violations by Philadelphia law enforcement
and prosecutorial actors.

Plaintiff notes for the Clerk's reference that EDPA 2:25-cv-06348-MRP (Dykes v. Philadelphia County
Court of Common Pleas et al.) involves overlapping institutional defendants and parallel constitutional
violations, and is noted for the Court's reference only under Local Rule 40.1.

Please issue summons for service on all named defendants. Plaintiff will arrange service pursuant to Fed.
R. Civ. P. 4.

Thank you for your assistance.

Respectfully submitted,

Chad Mark Franco Ferrari

Pro Se Plaintiff

1119 Wallace Street, 1st Floor, Philadelphia, PA 19123

Philadelphia, PA 19123

chadferrari@me.com

Enclosures: Complaint, JS-44 Civil Cover Sheet, Exhibit Binders (3)

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
FERRARI, Chad Mark Franco

**DEFENDANTS**
LEONARD, Det. Daniel; KILLMAN, Off. Robert A.; DAVIS,

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*
(Unknown at time of filing)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** / [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983; 28 U.S.C. § 1331

Brief description of cause:
Retaliatory arrest, warrantless cell phone search (Riley), Brady suppression, First and Fourth Amendment violations by Philadelphia law enforcement and prosecutorial actors

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
TBD at trial

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE    Hon. M.R. Pappert (EDPA 2:25-cv-06348)    DOCKET NUMBER    2:25-cv-06348-MRP

DATE
March 23, 2026

SIGNATURE OF ATTORNEY OF RECORD
Chad Mark Franco Ferrari, Pro Se Plaintiff

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

JS 44 Reverse (Rev. 04/21)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHAD MARK FRANCO FERRARI,** <br> Plaintiff, <br><br> v. <br><br> **DETECTIVE DANIEL LEONARD,** <br> individually and in official capacity; <br><br> **OFFICER ROBERT JAMES KILLMAN JR.,** <br> individually and in official capacity; <br><br> **DETECTIVE DAVIS (full name TBD),** <br> individually and in official capacity; <br><br> **DETECTIVE CHAD JETER,** <br> individually and in investigative capacity; <br><br> **OFFICER GONZALEZ (BADGE 504?),** <br> individually and in official capacity; <br><br> **LT. SHERIFF BARRY JOHNSON (BADGE 105),** <br> individually and in official capacity; <br><br> **SHERIFF ROCHELLE BILAL,** <br> in her official capacity as Sheriff / policy-maker; <br><br> **ADA BRETT ZAKEOSIAN,** <br> investigative and supervisory capacity; <br><br> **ADA VINCENT CORRIGAN,** <br> investigative and supervisory capacity; <br><br> **DA LARRY KRASNER,** <br> official capacity / policy-maker; <br><br> **RICHARD WILLIAMSON,** <br> private actor conspiring under color of state law; <br><br> **CITY OF PHILADELPHIA;** <br> **DOES 1-25,** <br> Defendants. | IN THE UNITED STATES DISTRICT COURT <br><br> EASTERN DISTRICT OF PENNSYLVANIA <br><br> Civil Action No. _____ <br><br> **TRACK 2 OF 5 — RETALIATORY ENFORCEMENT** <br><br> **JURY TRIAL DEMANDED** <br><br> **COMPLAINT UNDER 42 U.S.C. § 1983** <br><br> RELATED OR CONTEMPLATED MATTERS: <br> Ferrari v. Sulman et al. (Track 1) <br> Ferrari v. Blank Rome LLP et al. (Track 3) <br> Ferrari v. Williamson et al. (Track 4) <br> Ferrari v. Ferrari / Private Enterprise (Track 5) <br><br> **CHAD M.F. FERRARI, PRO SE** <br> 1119 Wallace Street, 1st Floor, <br> Philadelphia, PA 19123 <br> chadferrari@me.com <br><br> Filed: March 23, 2026 |

## PRELIMINARY STATEMENT

1.    Overview. This complaint — Track 2 of five coordinated federal civil-rights actions — targets the enforcement machinery through which Plaintiff Chad Mark Franco Ferrari was arrested three times in seven months, had his cell phone seized and searched without a warrant, had nineteen iMessages permanently destroyed in law-enforcement custody, had material Brady information suppressed for twenty days immediately before his third arrest, and was subjected to a pattern of retaliatory prosecution triggered by his protected speech. The defendants are Philadelphia police officers, detectives, sheriff personnel, prosecutors, a policy-making district attorney, a private landlord who coordinated with the warrant apparatus, the Sheriff as a policy-maker who weaponized official channels against Plaintiff, and the City of Philadelphia as the Monell entity.

2.    Why this track must be filed before April 2, 2026. On April 2, 2026, Plaintiff faces a waiver trial in MC-51-CR-0000640-2026 before Judge Tiffany Palmer — current Vice President of the Nicholas A. Cipriani Family Law Inn of Court, the same private professional organization whose confirmed membership roster places Judge Sulman, opposing counsel Vidas and Piscopo, and Judge Papademetriou in an undisclosed coordinated network. Filing Track 2 before that date: (a) creates a contemporaneous federal record of the retaliatory enforcement pattern and preserves Plaintiff's constitutional claims before further state-court escalation; (b) triggers the Younger bad-faith-initiation exception (Dombrowski v. Pfister, 380 U.S. 479 (1965)) given the documented void predicate; (c) establishes federal discovery rights to police body-cam, device extraction reports, and DA internal communications independent of anything Judge Palmer does on April 2; and (d) places every enforcement actor on federal litigation hold.

3.    The Three-Arrest Common Defect. Each arrest rests, directly or indirectly, on a PFA order that opposing counsel Mary Vidas admitted on the record was filed for residential possession, not for protection from abuse. (February 7, 2025 Wahl Hearing Transcript, p. 15 — Tier A certified transcript, Exhibit C.) A contempt charge predicated on a facially fraudulent protection order does not establish probable cause. Malley v. Briggs, 475 U.S. 335 (1986).

4.    Five constitutional anchors — each independently sufficient for relief. This complaint arises from a sequence of enforcement actions tracing to a civil courtroom: the criminal charge in MC-51-CR-0015343-2025 originated when a family court judge made statements from the bench indicating that criminal enforcement would follow from the June 18 proceeding, without charging authority, without referral to law enforcement, and without any finding of probable cause. That judge was subsequently recused from all Ferrari proceedings, named as a material witness by the Commonwealth's own prosecutors, and then found to have self-assigned to the resulting criminal case 91 days after his own recusal. The Commonwealth's own filing identifying that judge as a material witness confirms that the enforcement apparatus proceeded despite a known structural conflict. Each of the core constitutional claims pleaded here is independently

sufficient for relief. This complaint challenges completed executive-branch enforcement acts — a warrantless phone search, three arrests on defective or void predicates, institutional suppression of material conflict information, evidence destruction, and enforcement escalation supported by pre-coordination evidence — not the merits of any state-court judgment. No relief sought here requires this Court to review or disturb any state-court ruling. Every injury challenged is a completed act by an executive-branch defendant that caused harm independent of any pending adjudication. References to judicial conduct throughout this complaint are included solely to explain the factual origin of the executive-branch actions challenged here, not as a basis for liability or relief against any judicial officer. Where multiple facts are pleaded in sequence, each is offered as corroboration of a reasonable inference and not as independent proof of causation.

---

**ANCHOR A: PRE-WARRANT PHONE SEARCH — AUGUST 19, 2025**

Detective Leonard arrested Plaintiff on August 19, 2025 and seized Plaintiff's cell phone. On audio recording (Exhibit H), Detective Leonard admitted the phone was searched before a warrant was obtained. Riley v. California, 573 U.S. 373 (2014): 'Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple — get a warrant.' The warrant-free search is a per se Fourth Amendment violation. The phone was first seized at the June 18, 2025 Sulman hearing — confirmed on the certified transcript — and passed to law-enforcement custody. After obtaining a replacement device, Plaintiff discovered on the Thursday night into Friday — July 10–11, 2025, exactly one business day before the July 14, 2025 Sulman hearing — that 19 iMessages previously present and unread on his iMessage account had vanished, visible via iCloud sync on the replacement device while the original phone remained in law-enforcement custody. Leonard's own August 7, 2025 recorded admission that the device was accessed on "July 11–12" corroborates Plaintiff's iCloud discovery: the two data points lock the deletion window to within 24 hours of each other, constituting independently sourced evidence of when law enforcement accessed the phone and when the 19 messages disappeared. The timing — the eve of the hearing at which Plaintiff placed Segulin's government surveillance on the certified record — supports the reasonable inference that the deletion was not inadvertent, raising Arizona v. Youngblood, 488 U.S. 51 (1988), and California v. Trombetta, 467 U.S. 479 (1984), claims. The phone has never been returned to Plaintiff. No SHA-256 chain-of-custody verification has ever been provided. ADA Zakeosian's July 17, 2025 email places him at the charging-decision nexus in the weeks preceding the formal August 19, 2025 arrest. The criminal charge that became MC-51-CR-0015343-2025 was personally initiated from a family court bench — in a proceeding conducted without proper service on Plaintiff and with actual written notice of that defect in Blank Rome's possession. Pagnanelli officially withdrew as counsel on June 6, 2025. Blank Rome/Vidas served the June 16, 2025 emergency petition on Pagnanelli as counsel — two days before the June 18 hearing — despite his withdrawal ten days earlier. (Vidas letter to Pagnanelli, June 16, 2025, Exhibit W — Tier B.) Blank Rome had actual written notice of the defective service before the June 18

hearing and proceeded anyway, as reflected by contemporaneous written communications copied to Blank Rome c-suite personnel on June 16, 2025 — including formal preservation notices served on Testa and Pagnanelli prior to the hearing date. This is relevant to whether the defect was inadvertent or knowing. Judge Sulman himself acknowledged on the record at the June 18 hearing: 'Mr. Pagnanelli is not representing you anymore.' (June 18, 2025 Certified Transcript, p. 51, Exhibit U.) Sulman knew Plaintiff's counsel had withdrawn. Blank Rome knew it. The June 18 hearing proceeded without proper service on Plaintiff through valid counsel. The phone was seized in that improperly noticed proceeding. The criminal warrant was announced in that improperly noticed proceeding. The entire charging origin of MC-51-CR-0015343-2025 is embedded in a hearing conducted without constitutionally adequate notice to the defendant — directly implicating Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950). The judge who triggered the criminal charge was subsequently: (1) recused from all Ferrari proceedings on October 31, 2025; (2) named as a material witness by the DA's own office on January 13, 2026; and (3) found to have self-assigned to Case -0640 on January 29, 2026 — 91 days after his own recusal. The allegations involving Judge Sulman in this anchor are included solely as factual predicates explaining the origin of the enforcement actions taken by the named executive-branch defendants, not as independent claims against any judicial officer in this Track 2 action.

## ANCHOR B: THREE ARRESTS ON A VOID PREDICATE — JANUARY 10 & FEBRUARY 2, 2026

All three arrests trace to a December 24, 2024 PFA filing before DVU Emergency Duty Judge Michael Fanning — who was himself arrested by the Philadelphia Police Department on March 10, 2026 on charges of strangulation and aggravated assault of a domestic partner: the identical category of conduct the PFA purported to address. (6ABC, NBC10, Philadelphia Inquirer, March 10-12, 2026 — Exhibit R.) Furthermore, the authorizing judge's conduct was specifically contradicted by Plaintiff's contemporaneous medical billing records from treating psychiatrist Dr. McFadden, dated October 2 and October 21, 2024, reflecting diagnosis code F43.25 with chart notes stating 'Appearance: neat, casual. Mood: I think I'm okay' — records directly contradicted the PFA's characterization of Plaintiff as 'manic, emotionally dysregulated and psychotic.' An arrest on a warrant predicated on a fraudulent order does not establish probable cause.

## ANCHOR C: BRADY SUPPRESSION — 20-DAY INSTITUTIONAL CONCEALMENT

On January 13, 2026, ADA Corrigan filed a motion in Case -0015343 identifying Judge Sulman as a material witness. DA Certification of Service confirms receipt at 12:47 PM that day (Exhibit K — Tier A). Plaintiff's public defender did not disclose this to Plaintiff for twenty days — until minutes before the February 2, 2026 arrest. The DA's own filing naming the presiding judge as a material

witness constitutes material favorable information within the meaning of Brady v. Maryland, 373 U.S. 83 (1963). Its twenty-day institutional concealment across the DA's Office and the Defender Association — culminating in same-day arrest — is not inadvertence. This sequence supports the inference of deliberate institutional suppression of information that would have allowed Plaintiff to seek pretrial relief before his third arrest. Strickler v. Greene, 527 U.S. 263 (1999).

## ANCHOR D — TIER A
## ANCHOR D: GOVERNMENT SURVEILLANCE → PROTECTED RECORDING → RETALIATORY PROSECUTION PIPELINE

Cassi Segulin, the FJD digital court recorder assigned to Judge Sulman's courtroom, monitored Plaintiff's Instagram account in real time in the 24 hours immediately preceding both the June 18, 2025 and July 14, 2025 hearings — and ceased monitoring the moment each hearing ended. This is confirmed on the certified record of the July 17, 2025 hearing transcript (p. 18-19, Exhibit L-1) and the September 22, 2025 hearing transcript (pp. 17-24, Exhibit L-2), in which Plaintiff placed the surveillance pattern on the record. Within 24 hours of being named in the July 14 certified transcript, Segulin erased her LinkedIn profile, blocked Plaintiff on Instagram, and changed her handle from full name to first-name-last-initial — three simultaneous platform modifications supporting an inference of consciousness of guilt and spoliation of professional-affiliation evidence. Additionally, Plaintiff preserved a screenshot taken at 1:01 PM on July 14, 2025 — during the July 14 hearing — showing "Cassi Segulin" by name in Plaintiff's Instagram story viewer list. (Exhibit L-4 — Screenshot, July 14, 2025, 1:01 PM, showing "Cassi Segulin" in Instagram story viewers — Tier B, authenticated by device timestamp.) This screenshot is visual, timestamped proof of Segulin monitoring Plaintiff's Instagram account during the July 14 hearing itself. Combined with the transcript record documenting the surveillance pattern, this screenshot converts the surveillance allegation from certified-record-supported inference to direct visual evidence. A second Instagram account attributed to Piscopo's son ('Bailey Boo Piscopo') simultaneously monitored Plaintiff's account on June 18 hearing day. Plaintiff's stated reason for recording in the courtroom on June 18 — as placed on the certified record of the September 25, 2025 hearing (p. 7-8, Exhibit L-3) — was specifically to protect against transcript alteration by a court reporter who had been surveilling his protected speech ex parte. The June 18 phone seizure, which became the predicate for MC-51-CR-0015343-2025 and the August 19, 2025 arrest by Detective Leonard, was thus directly caused by prior government surveillance of Plaintiff's protected First Amendment expressive activity. Government conduct that chills protected speech and then criminalizes the speaker's protective response supports a First Amendment retaliation claim on the surveillance-to-prosecution causal chain. This is a documented, certified-transcript-anchored surveillance-to-prosecution causal chain.

**ANCHOR E — TIER A PUBLIC RECORD**
**ANCHOR E: PAPADEMETRIOU FAMILY CONFLICT — ADA DAUGHTER IN DA FAMILY VIOLENCE UNIT**

This count proceeds on two independent and calibrated theories, neither of which requires proof that Eleni Papademetriou Belisonzi Fritze or William Fritze III personally handled Plaintiff's prosecution. Theory A is a structural conflict non-disclosure violation: Judge Papademetriou issued the jurisdictional predicate order for Case -0001972 while her daughter held an active ADA position in the DA's Family Violence and Sexual Assault Unit — the specific unit responsible for processing PFA contempt charges of precisely the category charged against Plaintiff. This structural overlap — the judge and the prosecuting unit linked by immediate family — created a mandatory disclosure obligation under Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963), regardless of whether Eleni Fritze personally touched Plaintiff's file. Its non-disclosure deprived Plaintiff of the ability to seek prosecutorial recusal, judicial disqualification, and bail modification before the completed constitutional injuries described herein. Theory B is a retaliatory knowledge theory: Plaintiff publicly named Judge Papademetriou on his @ferrari_tribunal Instagram account in the period during which the DA's own digital surveillance of that account was documented and active — the same surveillance pipeline established by Segulin's pre-hearing monitoring and confirmed in four certified transcripts. When Plaintiff subsequently disclosed to ADA Zakeosian the Sulman coordination and the predicate fraud, Zakeosian — working in the same office as Papademetriou's family members — responded the same day with "You are currently under criminal investigation." The retaliatory arrest escalated within days. This theory does not require that Eleni or Fritze directed the retaliation. It requires only that the DA's office — whose personnel were monitoring Plaintiff's account and whose leadership knew Plaintiff was publicly naming a colleague's parent — had institutional motive to suppress Plaintiff's public exposure of the judicial apparatus, and acted on it. Whether Eleni or Fritze participated in, were consulted about, or were informed of any charging decision is a factual question for discovery. Both theories are cognizable as completed pretrial injuries independent of any trial outcome. On February 20, 2025, Judge Ourania Papademetriou — after disclosing on the pre-hearing record that she had spoken with opposing lead counsel Vidas within the week — issued an emergency temporary custody order with the hearing commencing 22 minutes after petition filing and the order issuing 2 hours and 20 minutes from filing — on a declared snowstorm day, without prior notice to Plaintiff, in a remote Microsoft Teams hearing during which Plaintiff's ability to participate was materially compromised. That order became the jurisdictional predicate for Case MC-51-CR-0001972-2026, the five-charge escalated criminal case. Her daughter, Eleni Papademetriou Belisonzi Fritze, is an actively licensed ADA at the Philadelphia District Attorney's Office assigned to the Family Violence and Sexual Assault Unit (Avvo public attorney profile, active Pennsylvania bar license 2013–present — Exhibit S-2, Tier B; NYT Wedding Announcement May 25, 2014 — Exhibit S-1, Tier A). The Family Violence and Sexual Assault Unit processes PFA contempt charges — the same category of charges in Cases -0640 and -0001972. Whether she had any direct or indirect involvement in charging

decisions affecting Plaintiff is a matter for discovery. Her husband, William John Fritze III, is Chief of the DA's Office Gun Violence Task Force (phillyda.org press releases March 26, 2025; December 11, 2025; March 2026 — Exhibit S-3, Tier A). His unit is distinct from the charges at issue and he is not alleged to have personally prosecuted Plaintiff; his relevance is institutional: his presence confirms that two immediate family members of the judge who issued Plaintiff's predicate order held supervisory positions in the prosecuting office during the prosecution, and that the DA's Office had an independent institutional reason — beyond Sulman — to suppress Plaintiff's public exposure of the judicial apparatus. Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009); Giglio v. United States, 405 U.S. 150 (1972); Nieves v. Bartlett, 587 U.S. 391 (2019).

## INDEPENDENT INJURIES CHALLENGED HERE

The following completed executive-branch injuries are the subject of this complaint. None requires this Court to review or set aside any state-court judgment. None is a disguised merits challenge to any family-court ruling. Each is an independent constitutional violation traceable to enforcement-branch actors:

| INJURY | DESCRIPTION — INDEPENDENT OF ANY STATE COURT RULING |
|---|---|
| Warrantless Phone Search (Aug. 19, 2025) | Leonard searched Plaintiff's phone before warrant; per se Riley violation; injury complete regardless of recording charge outcome |
| Three False Arrests on Void Predicate | Each arrest lacked probable cause derived from any independent, valid basis; all trace to a fraudulently obtained PFA whose fraudulent purpose was admitted on the record by the petitioner's own attorney |
| 20-Day Brady Suppression | DA's own filing naming its judicial officer as a material witness suppressed by the office for twenty days, disclosed minutes before the third arrest |
| Retaliatory Prosecution Sequence | Protected speech (recording to document court misconduct) → government surveillance → seizure → criminal charge; enforcement escalated in direct temporal response to Plaintiff's litigation exposure activities |
| Evidence Destruction — 19 iMessages | Physical evidence entrusted to law enforcement custody destroyed; Plaintiff suffered permanent loss of potentially exculpatory communications |
| Prosecutorial Conflict Non-Disclosure | DA office's failure to disclose structural conflict: Eleni Papademetriou Belisonzi Fritze = ADA Family Violence Unit (same unit processing Chad's charges); her parent issued the predicate order; direct involvement to be determined in discovery |
| Official Sheriff Retaliation | Sheriff Bilal's blocking of Plaintiff from official Sheriff Department social media platforms while Plaintiff had pending civil rights complaints against the Sheriff's department |

## JURISDICTION AND VENUE

5.    Original federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). All claims arise under 42 U.S.C. § 1983. Venue is proper under 28 U.S.C. § 1391(b). All acts and omissions occurred in Philadelphia, Pennsylvania.

6.    Younger Abstention Inapplicable. Three independent exceptions apply: (a) the state proceedings were initiated on a void predicate — a PFA whose fraudulent purpose was admitted on the record by the petitioner's own counsel (Dombrowski v. Pfister, 380 U.S. 479 (1965)); (b) the state forum has demonstrated structural inadequacy to protect Plaintiff's rights, as established by the Pennsylvania Commonwealth's own motion naming the presiding judge as a material witness (Gibson v. Berryhill, 411 U.S. 564 (1973)); and (c) each constitutional violation challenged here is a completed, independent executive-branch act — not a pending state-court ruling. The criminal matters are assigned to an out-of-county judge precisely because the Commonwealth itself acknowledged the Philadelphia judicial apparatus was compromised. Plaintiff does not seek dismissal of any pending charges, but seeks adjudication of completed constitutional violations independent of the outcome of any state proceeding.

7.    Rooker-Feldman Inapplicable. This complaint challenges enforcement acts — phone seizures, arrests, Brady suppression, and evidence destruction — by executive-branch actors independent of any state-court judgment. Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005).

## PARTIES

8.    Plaintiff Chad Mark Franco Ferrari, pro se, resides at 1119 Wallace Street, 1st Floor, Philadelphia, PA 19123 (mailing: 901 N. Penn St., Unit P-201). He is the father of Caia Ferrari (d.o.b. November 13, 2020) and Calvin Ferrari (d.o.b. October 29, 2022, cochlear implant). He has been arrested three times between August 2025 and February 2026 on charges arising from a fraudulently obtained PFA. He has been without income since May 2025 as a result of the coordinated legal and enforcement campaign described herein.

9.    Defendant Detective Daniel Leonard, Philadelphia Police Department, arrested Plaintiff on August 19, 2025 (MC-51-CR-0015343-2025), seized Plaintiff's cell phone, and — on audio recording — admitted conducting a pre-warrant phone search. Sued individually and in official capacity.

10.    Defendant Officer Robert James Killman Jr., Philadelphia Police Department, arrested Plaintiff on January 10, 2026 (MC-51-CR-0000640-2026). Arresting officer of record. Sued individually and in official capacity.

11. Defendant Detective Davis, Philadelphia Police Department, participated in the January 10, 2026 arrest alongside Killman. Full first name and badge number to be confirmed through discovery of the January 10, 2026 arrest report, body-camera records, and police department assignment logs for DC No. 2526068366. Sued individually and in official capacity.

12. Defendant Lt. Sheriff Barry Johnson (Badge 105), Philadelphia Sheriff's Department, physically removed Plaintiff from the Philadelphia Family Law courthouse building. Video surveillance evidence of the removal has been preserved. Additionally, Lt. Johnson detained Plaintiff without justification at the entrance to the men's bathroom in the Family Law courthouse for 2-3 minutes immediately after the June 18, 2025 and July 14, 2025 hearings, on multiple occasions, while opposing party Julie Ferrari and Blank Rome attorney Michelle Piscopo walked past the area deliberately and slowly — a coordinated choreography with no legitimate security purpose. These targeted, zero-justification detentions at peak moments of Plaintiff's protected litigation activity constitute a pattern of retaliatory courthouse harassment, establishing that Lt. Johnson's courthouse conduct was not random but part of an enforcement posture coordinated with the civil litigation proceedings. Courthouse video surveillance confirms the timing and circumstances. Sued individually and in official capacity.

13. Defendant Sheriff Rochelle Bilal is the elected Sheriff of Philadelphia County and the final policy-making official for the Philadelphia Sheriff's Department. As the final policy-maker for the Sheriff's Department, any authorized use of Sheriff personnel for courthouse entry, warrant execution coordination, or physical removal of a litigant from a courthouse building — including any door-access or forced-entry operations authorized through or by the Sheriff's Department — would require either her direct authorization or reflect a departmental custom, policy, or practice attributable to her in her official capacity. Discovery will determine the extent of her personal direction of or acquiescence in the specific acts alleged herein. She is sued in her official capacity as policy-maker and as a supervisory actor whose department's customs are at issue. Sheriff Bilal made public statements, including on television and social media, that can reasonably be interpreted as directed at Plaintiff's civil rights complaints against her department. She blocked Plaintiff from the official Philadelphia Sheriff's Department social media accounts — a viewpoint-discriminatory act under Davison v. Randall, 912 F.3d 666 (4th Cir. 2019); Pabst v. Wygant, No. 21-2049 (3d Cir. 2022) (government official's blocking of constituent from official government social media account is government action — Third Circuit), when conducted from official government platforms. She is sued in her official capacity as policy-maker for the customs, training failures, and retaliatory practices of the Sheriff's Department described herein, and in her individual capacity to the extent her personal blocking of Plaintiff from official government accounts constitutes a viewpoint-discriminatory act under clearly established First Amendment law.

14.     Defendant ADA Brett Zakeosian, Philadelphia DA's Office, whose July 17, 2025 email — in which he responded to Plaintiff's documentation of the false probable-cause basis by stating "You are currently under criminal investigation" (Exhibit Z-3/Z-4 — Tier A, authenticated official government email headers, July 17, 2025) — places him at the charging-decision nexus preceding the August 2025 arrest, and who is identified by name in a recorded statement by Adam Sequoyah Yee, Esq. as the supervisory actor directing the retaliatory enforcement posture — 'Brett wants to protect the system.' (Exhibit J — Tier C audio, pending chain-of-custody certification.) This recording is cited as corroborative evidence supporting personal supervisory involvement in the retaliatory enforcement decision under Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988). In the same recorded conversation, Yee further stated that Plaintiff would have eventually received his phone back, but that because Plaintiff "made noise about it" — specifically by documenting the false probable-cause basis and emailing Zakeosian July 17 — the arrest became necessary. This statement by Plaintiff's own retained defense attorney constitutes a statement supporting the inference of retaliatory causation: Plaintiff's own retained attorney stated on audio that the protected speech — documenting the constitutional violation — was the stated reason enforcement proceeded. Nieves v. Bartlett, 587 U.S. 391 (2019) requires a showing of retaliatory causation; the statement by Plaintiff's own retained attorney supports that inference at the pleading stage. Sued in investigative and supervisory capacity. The conduct alleged herein — including the July 17, 2025 charging email, supervisory direction of the prosecution posture, and warrant coordination — constitutes pre-charging investigative acts to which absolute prosecutorial immunity under Imbler v. Pachtman, 424 U.S. 409 (1976), does not extend. Burns v. Reed, 500 U.S. 478 (1991); Buckley v. Fitzsimmons, 509 U.S. 259 (1993).

15.     Detective Chad Jeter, Badge #701, Philadelphia District Attorney's Office, Philadelphia County Detectives, Juvenile Diversion/SIU/ECU Unit — the same Special Investigations Unit as ADA Zakeosian — sent two emails to Plaintiff on January 7 and January 8, 2026, purporting to notify Plaintiff of a court appearance at the Criminal Justice Center on January 8 at 9AM. (Exhibit Z-6 — Tier A: official government emails, chad.jeter@phila.gov.) The first email threatened arrest if Plaintiff failed to appear; the second was sent same-day. Plaintiff was out of town. The emails constituted the totality of notice for the proceeding from which a bench warrant issued — a proceeding that generated the charging predicate for the January 10 arrest. Detective Jeter's role as the notice conduit from the SIU unit to Plaintiff, while Plaintiff was out of town and without proper service of process, supports the reasonable inference of deliberate notice deficiency coordinated within the same unit responsible for the charging decisions. Named as a potential Does defendant and discovery target. Sued in individual and official capacity to the extent discovery confirms supervisory direction of the defective notice methodology. 16. Defendant     ADA     Vincent Corrigan, Philadelphia DA's Office, filed the January 13, 2026 motion naming Judge Sulman as a material witness and oversees enforcement posture against Plaintiff. Sued in investigative and supervisory capacity.

17.     Defendant District Attorney Larry Krasner, elected DA of Philadelphia County and policy-making official. His office's enforcement practices, prosecutorial coordination with family-court actors, failure to

institute conflict protocols after its own motion named a sitting judge as a material witness, failure to disclose the Papademetriou family conflict, public posting of two Instagram posts on January 10, 2026 — the same day as Plaintiff's arrest, five days after Plaintiff publicly booed Krasner at his inauguration — including the "FAFO" sunglasses post and a "I said what I said" post (Exhibit X), and public launch of the official F.A.F.O. Coalition (Fight Against Federal Overreach) on January 28-29, 2026, constitute official policy and support Plaintiff's retaliatory-enforcement and Monell theories. Sued in official capacity.

18.    Defendant Richard Williamson, private citizen and former landlord. Named in this Track because his documented coordination with the Philadelphia warrant apparatus — retention of Weisgold on December 29 (11 days before the January 10 arrest), textual communications referencing Julie Ferrari and Judge Sulman, concurrent physical abuse of Plaintiff's mother during the arrest window (January 10-12, 2026), Weisgold's written pre-teasing of property seizure to Patricia Ferrari before the arrest, and the March 16, 2026 video-captured physical confrontation — establishes joint action under color of state law. Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982). The Praecipe to Discontinue filed on March 12, 2026 — the same day the Garcia hearing compelled key return — is consciousness-of-guilt/abuse-of-process evidence.

19.    Defendant City of Philadelphia, a municipality subject to Monell v. Department of Social Services, 436 U.S. 658 (1978), for the policies, customs, and practices of the Philadelphia Police Department, District Attorney's Office, and Sheriff's Department enabling the violations described herein.

20.    Does 1-25 include officers, prosecutors, court staff, and others whose identities will be established through discovery. Named defendants Gonzalez (Badge 503/504) and Jeter are identified in the caption and Parties section; they are not duplicated here. The following additional individuals are specifically identified: DOE-1: Officer Robert Scarpello, Philadelphia Police Department, identified as arresting officer of record for Case MC-51-CR-0001972-2026 (Criminal Docket 3 — Tier A). His specific conduct during the February 2, 2026 arrest and any coordination with other arresting officers will be established through discovery. On February 2, 2026, Scarpello entered the courtroom and arrested Plaintiff publicly before assembled court participants — within approximately five minutes of Plaintiff's Brady disclosure in the adjacent hallway. The public spectacle manner of that arrest is consistent with the courthouse-intimidation pattern documented throughout this complaint. His coordination role will be confirmed through discovery. DOE-2: Unidentified female individual — either DA Office or Defender Association personnel — present in the courthouse hallway during Plaintiff's conversation with public defender Nelson on February 2, 2026, who exited the area immediately after that exchange concluded. Discovery of DA and Defender Association staffing records and February 2, 2026 courthouse surveillance will confirm her identity and whether she communicated the hallway conversation's contents to the arresting officers who executed the public arrest within minutes.

## FACTUAL ALLEGATIONS

### I. The Predicate: A Fraudulent PFA Order Authorized by a Judge Later Arrested for Domestic Violence

21.     On December 24, 2024, DVU Emergency Duty Judge Michael Fanning authorized a temporary PFA petition characterizing Plaintiff as 'manic, emotionally dysregulated and psychotic.' No prior hearing was held. Plaintiff received no advance notice.

22.     Contemporaneous medical billing records from Plaintiff's treating psychiatrist, Dr. McFadden, dated October 2 and October 21, 2024 — weeks before the PFA filing — reflect diagnosis code F43.25 (Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, per DSM-5) and chart notes reading: 'Appearance: neat, casual. Mood: I think I'm okay.' These records directly contradict the clinical characterization in the PFA petition. They constitute Tier A evidence that the predicate clinical claims were fabricated.

23.     On February 7, 2025, at a hearing before Hon. Elizabeth Wahl, opposing counsel Mary T. Vidas stated on the record at page 15: 'Because she got exclusive possession of the house' — explicitly linking the PFA to a residential-possession objective, not protection from abuse. This binding on-record admission voids the probable-cause foundation of every arrest predicated on that PFA.

24.     On March 10, 2026, the Philadelphia Police Department arrested Judge Michael Fanning — the DVU judge who had authorized the December 24, 2024 PFA — on charges of strangulation and aggravated assault of a domestic partner: the identical category of conduct the PFA purported to address. Judge Fanning was immediately suspended without pay by the First Judicial District. (See Philadelphia Inquirer, March 10, 2026; 6ABC, March 12, 2026 — Exhibit R.) The DVU gatekeeping judge who authorized the PFA predicate was suspended for the exact conduct the PFA was supposed to prevent. This further destroys any presumption that the December 24, 2024 PFA was authorized through a constitutionally adequate gatekeeping process.

### II. The Segulin Surveillance Pipeline — Anchor D: Government Pre-Hearing Speech Surveillance Leading Directly to Criminal Charge

25.     Prior to the June 18, 2025 hearing in Courtroom 6F before Judge Sulman, Cassi Segulin — the FJD digital court recorder employed by and assigned to Judge Sulman's courtroom — monitored Plaintiff's Instagram account in the immediate 24-hour pre-hearing window. The activity ceased as soon as the hearing ended.

26.    This surveillance pattern recurred before the July 14, 2025 hearing. On approximately June 19, 2025 — one day after the phone seizure — Plaintiff attempted to file with court intake clerk Marco Capone a formal motion to preserve all raw courtroom audio/video digital transcripts and a whistleblower notice. Capone called down to Judge Sulman's chambers during the filing; Plaintiff was told the motion could not be filed. (Tier B — Plaintiff's contemporaneous account; subject to confirmation through Capone's call logs in discovery.) The obstruction of a preservation filing one day after the phone seizure is consistent with the concurrent criminal referral and supports the inference of institutional coordination. Segulin's Instagram monitoring activity is documented by Plaintiff's own receipt of Instagram activity notifications, which he placed on the certified court record. These facts are confirmed in the following certified transcripts: July 17, 2025 hearing (p. 18-19): 'Prior to both previous hearings, I received activity notifications on my Instagram showing that Ms. Cassi Segulin, Court Digital Recorder, was reviewing my Instagram stories up until real time, before we came in here.' September 22, 2025 hearing (pp. 17-24): Plaintiff raised the same surveillance pattern on the record; Sulman stated first "I had nobody monitor anything ex parte, sir" — an active denial — and then, three lines later in the same exchange: "I don't know, sir. And it doesn't concern me." The self-contradiction — simultaneously denying monitoring and acknowledging ignorance of whether it occurred — is itself on the Tier A September 22, 2025 certified record September 25, 2025 hearing (pp. 7-8): Plaintiff stated on the record: 'The reason I did that was because Judge Sulman's digital court reporter, Cassi Segulin, was monitoring my social media leading up until the hearings ex parte. And I was worried that she was going to mess up — mess the transcripts up or alter it.'

27.    Simultaneously, a second Instagram account identified as "Bailey Boo Piscopo" — attributed to the son of Blank Rome attorney Michelle Piscopo — monitored Plaintiff's account on June 18 hearing day. On June 16, 2025 — two days before the hearing — Blank Rome's Piscopo had claimed that posting on Plaintiff's Instagram account constituted valid service of process under Pa.R.C.P. 440. No written consent for electronic service was ever provided by Plaintiff, as Pa.R.C.P. 440 requires. On June 18, the same Instagram account was under active pre-hearing monitoring by the court's own digital recorder (Segulin) and by an account attributed to Piscopo's son — the same platform Blank Rome had identified as its claimed service vehicle, in the same 48-hour window. The account attributed to Piscopo's son blocked Plaintiff after Plaintiff noted the viewership — a conscious act after being observed. On September 22, 2025, when Plaintiff raised this on the certified record, Piscopo responded: "You have a public Instagram — page" — not denying the account was her son's, not denying the viewing. That implicit acknowledgment is on a Tier A certified transcript.

28.    Within 24 hours of being named in the July 14 transcript, Segulin's LinkedIn profile was erased — a fact supporting an inference of consciousness of guilt and spoliation of professional-affiliation evidence.

29.     On the same certified transcript page as the June 18, 2025 phone seizure (p. 62, Exhibit U — Tier A), opposing counsel Piscopo immediately converted the seizure into a custody weapon: "Your Honor, my client's concern is he's supposed to have the kids under the order on Friday — unless Your Honor suspends his custody time." This pivot — from phone seizure to immediate custody suspension request — on the same transcript page, within the same breath, is documented evidence that the recording charge was instrumentalized for residential-possession objectives in real time. It is consistent with Vidas's February 7, 2025 on-record admission (p. 15, Exhibit C — Tier A) that the underlying PFA was filed for residential possession, not protection from abuse. The phone seizure and the custody suspension attempt were a single coordinated maneuver, documented on one certified transcript page.

### III. Arrest One: August 19, 2025 — Detective Leonard — Warrantless Search and Recording Charge

30.     On August 19, 2025, Detective Leonard arrested Plaintiff on recording charges (MC-51-CR-0015343-2025). At arrest, Leonard seized Plaintiff's cell phone and — on audio (Exhibit H) — admitted searching it before obtaining a warrant. Riley v. California, 573 U.S. 373 (2014) is categorical. Beyond the warrantless search, the recording charge itself rests on a warrant affidavit that is materially false in its core probable-cause foundation — as documented in three independent Tier A sources that expose a manufactured chain of false premises: The recording charge warrant is subject to challenge under Franks v. Delaware, 438 U.S. 154 (1978), on three independent factual grounds, each of which supports the reasonable inference that the probable-cause affidavit rested on a foundation alleged to be materially false or materially misleading in the representation made about courtroom signage. First: Leonard stated on audio (Exhibit H) that Johnson told him signs prohibiting recording were posted in the courtroom — a representation that formed part of the charging basis. Second: Sulman stated on the certified June 18, 2025 hearing record that no sign was posted in his courtroom. (Exhibit U — Tier A.) The judge presiding over the alleged violation directly contradicted the premise communicated to Leonard by Johnson. Third: a new cellphone policy handout appeared on July 14, 2025 — twenty-six days after the June 18 arrest — supporting the inference that no adequate notice mechanism existed on June 18. (Exhibit Z-2 — Tier B.) Fourth and most significantly: on July 17, 2025, Plaintiff emailed both Zakeosian and Detective Leonard (CC'd directly) documenting the false signage premise and the post-arrest appearance of the policy handout. Zakeosian responded the same day: "You are currently under criminal investigation." (Exhibit Z-3, Z-4 — Tier A email chain.) Detective Leonard was therefore in possession of written documentation of the false probable-cause premise on July 17 — 33 days before he executed the August 19 arrest warrant. Two independent Franks violations are documented: first, Zakeosian filed the warrant application on approximately July 18, 2025 — within 24 hours of receiving Plaintiff's July 17 email documenting the false probable-cause basis — using Plaintiff's own documentation of the defect as the trigger for the warrant rather than the basis for its withdrawal; second, Leonard executed that warrant on August 19, 2025 — 33

days after receiving written notice that its probable-cause basis was false. An officer who executes a warrant 33 days after receiving written notice that its probable-cause basis is false acts with reckless disregard for the truth under Franks v. Delaware, 438 U.S. 154 (1978). The Franks violation is not inferential — it is supported by a documented email chain establishing Leonard's actual knowledge of the defect before execution. Franks v. Delaware, 438 U.S. 154 (1978); Nieves v. Bartlett, 587 U.S. 391 (2019).

31.     The phone seized at the June 18, 2025 Sulman hearing has never been returned to Plaintiff. After obtaining a replacement device, Plaintiff discovered on the Thursday night before the July 14, 2025 hearing — while the phone remained in law-enforcement custody — that 19 iMessages previously present and unread on his iMessage account had disappeared, detected via iCloud sync on the replacement device. No SHA-256 chain-of-custody certificate has ever been provided. The selective disappearance of 19 messages from law-enforcement custody on the eve of a major Sulman hearing raises Arizona v. Youngblood, 488 U.S. 51 (1988), and California v. Trombetta, 467 U.S. 479 (1984), claims. The timing — specifically the night before the July 14 hearing at which Plaintiff had placed Segulin's surveillance conduct on the record — supports the inference of bad faith required under Youngblood.

32.     ADA Zakeosian's July 17, 2025 email places him at the charging-decision nexus immediately preceding the August 19, 2025 arrest. (Exhibit Z-1 — Tier B.) The Rule 600 speedy trial clock for Case - 0015343 has been running since August 19, 2025. The unauthorized February 2, 2026 Joint Continuance Request, filed by public defender Lewandowski without Plaintiff's knowledge or consent, raises contested tolling issues currently before Judge Sprecher and additionally deprived Plaintiff of due process in the charging timeline itself. Each of these three facts — the charging email, the Rule 600 clock, and the unauthorized tolling — are independent grounds supporting the retaliatory enforcement theory.     33.     A Tier A fact connecting the family court corruption track to the retaliatory enforcement track is this: on July 14, 2025, in open court before Judge Sulman in the family court proceeding (Certified Transcript, July 14, 2025, pp. 189-190, Exhibit T — Tier A), Judge Sulman confirmed on the First Judicial District's own record that ADA Brett Zakeosian was 'the one handling' Plaintiff's criminal case and that return of the phone was 'up to them.' This occurred 26 days after Sulman had personally announced from the same family court bench that 'a warrant [would be] sworn out' against Plaintiff (June 18, 2025 Certified Transcript, pp. 61-63, Exhibit U — Tier A). Taken together, these two Tier A entries from consecutive family court hearings establish that Judge Sulman: (a) personally directed the initiation of the criminal charge on June 18 from his civil bench; and (b) confirmed on July 14 which ADA was managing the charge he had directed. Taken together, these Tier A entries support the reasonable inference that the June 18 charge did not emerge from independent law-enforcement initiation, but from a family-court event that Sulman both triggered and later tracked. A further documented Tier A fact from the July 14 transcript (pp. 8–9): when Plaintiff raised a conflict based on the Cipriani Inn relationship, Sulman stated on the certified record: "We attended the same law school and didn't know each other in law school." Sulman thereby confirmed on a Tier A certified transcript that he and opposing counsel Piscopo attended Temple Law

together — the same institution whose alumni pipeline runs through the entire Cipriani Inn network — while denying a social relationship. That denial is contradicted by the Cipriani Inn founding records, which place both Sulman and Piscopo as members of the same organization — facts that are evaluated as predicates to the executive enforcement acts challenged here, not as a basis for judicial liability in this Track. 34.        Adam Sequoyah Yee disclosed on audio recording that he and ADA Zakeosian had prior working relationship with Zakeosian on a prior law enforcement matter in Northeast Philadelphia — a professional relationship built within the same prosecutorial ecosystem — a pre-existing personal and professional relationship between the defense-side attorney who confirmed the retaliatory directive ('Brett wants to protect the system') and the prosecution-side ADA who issued it. This prior relationship is not alleged as misconduct standing alone. It is relevant because it explains the mechanism by which Yee received the retaliatory directive and confirms Zakeosian's personal supervisory involvement under Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988). Three independent sources corroborate Zakeosian's personal involvement in the enforcement posture: (1) Yee's audio recording identifying Zakeosian by name; (2) Judge Sulman's July 14 family court transcript confirming Zakeosian's handling of the case; and (3) Zakeosian's own July 17, 2025 charging email. Taken together, these sources support Plaintiff's supervisory-liability theory under Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988).

## IV. Arrests Two and Three: January 10 and February 2, 2026 — Killman/Davis and the Brady Suppression

35.        On January 10, 2026, Killman and Davis arrested Plaintiff (Case -0640). The charges — contempt and terroristic threats — rest on PFA3 (November 14, 2025), which itself traces through PFA2 (dismissed November 7 for defective service) to the December 24, 2024 Fanning PFA. The entire predicate chain originates in a filing before a judge subsequently arrested for domestic violence, for a purpose its own attorney admitted was residential possession. The arrest contains additional constitutional defects: (a) Manufactured Warrant Predicate. The docket for Case -0015343 confirms a January 8, 2026 status hearing before Judge Joffie C. Pittman III, Room 404, followed by a Bench Warrant Hearing scheduled for January 12, 2026. (Criminal Docket MC-51-CR-0015343-2025, Exhibit — Tier A.) Plaintiff received no constitutionally adequate notice of the January 8 hearing: DOE-2 (Detective Jeter) sent notice emails to an account Plaintiff did not regularly monitor, one of which landed in Plaintiff's junk folder, the other sent the evening of January 7 while Plaintiff was out of the area — both lacking the dates, times, location, presiding judge identification, and proper addressing to Plaintiff's known residence at 1119 Wallace Street required for lawful criminal notice. Additionally, no public defender appeared on Plaintiff's behalf at the January 8 hearing. The complete absence of defense counsel at a hearing that resulted in a bench warrant constitutes a per se violation under United States v. Cronic, 466 U.S. 648 (1984) — complete denial of counsel at a critical stage of criminal proceedings for which prejudice is presumed. A bench warrant arose from Plaintiff's non-appearance at the defectively noticed January 8 hearing. Killman and Davis then arrested Plaintiff on January 10 — two days before the January 12 bench warrant hearing at which Plaintiff could have contested that warrant. The arrest preempted Plaintiff's ability to challenge the manufactured warrant

predicate. This sequence — defective notice → non-appearance → bench warrant → arrest two days before the challenge hearing — supports the reasonable inference of a manufactured probable-cause sequence under the Fourth Amendment. (b) Civil Enforcement Interrogation During Criminal Arrest. During the January 10, 2026 arrest, Killman and Davis questioned Plaintiff about civil matters — specifically, his last rent payment and why he remained at the property. A criminal arrest for PFA contempt has no nexus to rent payment history. This interrogation demonstrates that the criminal arrest was being used as a civil enforcement tool coordinated with Williamson's concurrent eviction proceedings — conduct supporting the inference of civil/criminal enforcement coordination central to the Lugar joint-actor theory. (c.1) Prior to the January 10 arrest, Plaintiff had communicated in writing that he sought to route any communications through counsel and requested third-party-mediated or chaperoned contact with opposing parties, in an effort to comply procedurally and de-escalate. The decision to proceed with a criminal arrest rather than accommodate that request is relevant to pretext, retaliatory motive, and the absence of a neutral enforcement basis. (c) Service Defect — Known Residence Not Served. Plaintiff's known address throughout all relevant proceedings is 1119 Wallace Street, Philadelphia, PA 19123. Neither the PFA predicate proceedings nor the criminal arrest notices were served at this address. Blank Rome's certificates of service reflect service on Pagnanelli at Testa & Pagnanelli — not on Plaintiff at his known residence. This systemic service defect runs through the entire enforcement chain from the December 24, 2024 PFA through the January 10, 2026 arrest.

36. On January 13, 2026, ADA Corrigan filed a motion in Case -0015343 naming Judge Sulman as a material witness. DA Certification of Service confirms Kevin Yao received it at 12:47 PM that same day (Exhibit K — Tier A). This information was not disclosed to Plaintiff for twenty days. On February 2, 2026, public defender Matthew Nelson disclosed it to Plaintiff minutes before Killman's second arrest — and simultaneously, Case -0001972 (five-charge escalated case) was initiated.

37. The twenty-day suppression was institutional: three separate attorneys across the DA's Office and Defender Association held the same filing. Three attorneys. Twenty days. One suppressed disclosure that the presiding judge had been identified as a witness by the DA itself. The Brady material was disclosed to Plaintiff in a hallway conversation with public defender Nelson that lasted approximately ten minutes. Nelson then told Plaintiff to wait approximately thirty minutes, then left. Plaintiff waited. Nelson did not return for the full interval. Within five minutes of Nelson finally returning, Officer Scarpello entered the courtroom and arrested Plaintiff publicly before the assembled court participants — a compressed sequence of Brady disclosure, wait, and immediate public arrest that supports the inference the disclosure was timed to prevent Plaintiff from acting on it. The proximity — Brady disclosure in a hallway, wait, immediate arrest — supports the inference that the disclosure was timed deliberately to prevent Plaintiff from acting on it before enforcement. No independent law enforcement basis for the arrest on February 2, 2026 had changed in the twenty days the Brady material was withheld. The only thing that changed was that Plaintiff now knew it. 38. Serial Arrests on Same Predicate Communication — Independent Constitutional

Claim. The December 24, 2024 email to Julie Ferrari — a parental communication sent on Christmas Eve asking to see his children — was used as the basis for arrest on January 10, 2026. The same email was then alleged again as the basis for the February 2, 2026 arrest. Arresting Plaintiff twice for the same predicate communication, without any new intervening act, supports the inference of bad-faith manipulation of the charging predicate, and may give rise to double-exposure concerns to create additional arrest opportunities around the period of maximum Brady and judicial-conflict exposure. 39. Magistrate Connor Threat at February 2, 2026 Arraignment. Following the February 2, 2026 arrest, Plaintiff appeared before Magistrate Lauren Connor for arraignment. The criminal docket for Case MC-51-CR-0001972-2026 confirms Connor's identity and role: Entry 2, February 2, 2026, "Bail Set — Ferrari, Chad," filed by "Connor, Lauren." (Criminal Docket MC-51-CR-0001972-2026 — Tier A.) For Case MC-51-CR-0000640-2026, the bail and discharge document (DC#: 25-26-068366) reflects bail magistrate RIGMAIDEN-DELEON setting bail at $25,000 with two Stay-Away Orders issued. Plaintiff was never served either the charges document or the Stay-Away Order — confirmed by Plaintiff's January 13, 2026 Instagram story displaying the bail document with the caption "Was never served either Document" (@ferrari_tribunal, January 13, 2026 — Tier B). During that proceeding, Magistrate Connor stated, as alleged based on Plaintiff's contemporaneous recollection, that Plaintiff had been arrested because of the email he sent to Judge Sulman the night before — after Plaintiff attempted to explain that Sulman had recused himself on October 31, 2025, and had then self-assigned to Case -0640 on January 29, 2026. Magistrate Connor refused to hear Plaintiff's account of the self-assignment and threatened to remand Plaintiff to jail with bail set at $1 million if he continued to raise Judge Sulman's name. Critically, the one-million-dollar bail threat paired with a six-month detention warning to silence Plaintiff about Sulman was not an isolated statement: the same six-month detention threat had previously traveled through two other channels — from Sulman through Zakeosian to Goldstein (Tier C audio), and then through Brian Johnson at the February 2 arraignment (same proceeding) — creating a documented three-channel coordination of the same specific deterrent figure. A magistrate judge threatening a one-million-dollar bail remand to suppress a defendant's disclosure of a judicial conflict at the defendant's own arraignment is an independent constitutional violation: it deprived Plaintiff of the right to present conflict information at a bail proceeding, silenced protected speech about judicial conduct, and constitutes the kind of intimidation that — combined with the surrounding Brady suppression — supports the inference of coordinated institutional pressure to prevent Plaintiff from exposing the Sulman conflict chain. Additionally, at the February 2 proceeding, the short female public defender who appeared told Plaintiff that ADA Vincent Corrigan had already moved for appointment of an out-of-county judge and that Plaintiff did not need to have appeared. That disclosure — made for the first time at arraignment — confirmed that the Brady material (the January 13 DA motion) had been withheld from Plaintiff for twenty days, through his arrest, through his arraignment. Had Plaintiff known of Corrigan's motion the day it was filed, he could have sought relief the following day rather than being arrested and appearing before a magistrate who threatened him into silence about the very conflict the motion documented. 40. Administrative Chambers Directive Used as Criminal Predicate Without a Court Order. The February 2, 2026 criminal complaint and related proceedings included the assertion that Plaintiff had been

"previously told not to contact chambers." This assertion traces directly to a written directive issued by court administrative staff Margaret Tobey banning Plaintiff from contacting chambers by email — a directive imposed approximately 45 minutes before the June 18, 2025 hearing at which the phone was seized. (Tobey email chain, June 17-18, 2025, Exhibit Q — Tier B.) On the certified record of that very June 18 hearing, Plaintiff stated: "your Court issued a written gag order telling me I cannot contact them by e-mail through the staff." Sulman responded: "That's not a gag order." (June 18, 2025 Certified Transcript, p. 54-55, Exhibit U — Tier A.) This exchange is dispositive: a chambers email-contact ban is an administrative directive, not a court order. It was issued without a hearing, without notice, without discovery, and without any judicial process. Using it as a predicate for a criminal arrest — asserting a defendant violated it by contacting chambers — without a formal court order backed by due process is a constitutional violation independent of any other claim. A person cannot be arrested for violating a judicially-disclaimed administrative email restriction. The February 2 arrest, in part predicated on this chambers-contact characterization, thereby rests on a non-judicial directive that was never elevated to an enforceable court order through any constitutionally adequate process. Mathews v. Eldridge, 424 U.S. 319 (1976); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).

## V. The Papademetriou Family Prosecutorial Conflict — Anchor E

41.    On February 20, 2025, Judge Ourania Papademetriou — after disclosing pre-hearing ex parte contact with opposing lead counsel Vidas — issued an emergency temporary custody order within 22 minutes, without notice to Plaintiff, on a declared snowstorm day. That order became the jurisdictional predicate for Case MC-51-CR-0001972-2026.

42.    A New York Times wedding announcement dated May 25, 2014 (public record, Tier A — Exhibit S) identifies Eleni Papademetriou Belisonzi Fritze as Judge Papademetriou's daughter and an ADA in the Philadelphia District Attorney's Family Violence and Sexual Assault Unit. Her husband, William John Fritze III, is Chief of the DA's Office Gun Violence Task Force, confirmed by phillyda.org press releases (Exhibit S-3 — Tier A). The Family Violence and Sexual Assault Unit is the specific unit responsible for processing PFA contempt charges — the same category as Cases -0640 and -0001972. Whether Eleni Fritze personally participated in any charging decision affecting Plaintiff is a question for discovery. The undisclosed structural fact — that Judge Papademetriou's daughter holds an active position in the exact unit processing the charges arising from her mother's own predicate order — is itself the constitutional deficiency, regardless of direct involvement.

43.    The DA's Office had an obligation under Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963), to disclose that the judge who issued the predicate order for Case -0001972 had a daughter in the exact prosecutorial unit handling that category of charges. That structural fact was never disclosed, depriving Plaintiff of the ability to seek prosecutorial recusal, challenge the

predicate order on conflict grounds, or use the non-disclosure at bail hearings. Additionally: Plaintiff publicly named Judge Papademetriou on his @ferrari_tribunal Instagram account during the period the DA's surveillance of that account was active and documented — the same account Segulin monitored before hearings and through which Blank Rome claimed service. When Plaintiff disclosed the Sulman coordination to ADA Zakeosian, he was simultaneously naming Zakeosian's colleague's parent as a participant in the judicial fraud on a publicly surveilled Instagram account. Zakeosian responded the same day: "You are currently under criminal investigation." The non-disclosure of the Papademetriou family conflict, the institutional awareness of Plaintiff's public naming of Judge Papademetriou, and the immediate retaliatory response together support the inference that the DA's office had independent institutional motive to suppress Plaintiff's exposure of the apparatus. Whether any member of the Papademetriou family directed, approved, or was informed of any charging decision is a matter for discovery and does not affect the disclosure obligation, which attached by operation of the structural conflict itself.

## VI. Retaliatory Pattern — DA Krasner and the Enforcement Posture

44.     DA Larry Krasner established a documented public enforcement posture across a 23-day window directly contemporaneous with Plaintiff's arrests. That posture is established by four independent public records, each self-authenticating under Fed. R. Evid. 901 and subject to judicial notice under Fed. R. Evid. 201(b)(2): (a) January 5, 2026 — Krasner inauguration, Kimmel Center: "If anybody — including the guy in D.C. — doesn't want that, if they want to F around, then they're gonna find out." (Philadelphia Inquirer, January 5, 2026 — Exhibit KRASNER-1, Tier A.) Five days before Plaintiff's January 10 arrest. (b) January 8–9, 2026 — public press conference and official statement: "You will be arrested. You will stand trial. You will be convicted. Donald Trump cannot pardon you for a state court conviction." (Billy Penn / Pravda EN, January 8–9, 2026 — Exhibit KRASNER-2, Tier A.) This constitutes a public declaration that state prosecution was being deployed specifically as a firewall against federal intervention — including federal civil rights oversight, DOJ accountability review, and presidential pardon authority. One to two days before Plaintiff's January 10 arrest. (c) January 10, 2026 — same day as Plaintiff's arrest: Krasner publishes the "FAFO" sunglasses post and "I said what I said" to verified @larrykrasner (Exhibit X — Tier B). (d) January 28–29, 2026 — Krasner officially launches the F.A.F.O. Coalition (Fight Against Federal Overreach) and convenes a multi-state prosecutors' coordination call, publicly declaring: "Just as you have come together there are state prosecutors coming together right now... if we have to hunt you down the way they hunted down Nazis for decades, we will find your identities. We will find you." (Gateway Pundit / Townhall, January 28–29, 2026 — Exhibit KRASNER-3, Tier A; phillyda.org press release — Exhibit X.) The but-for causation element under Nieves v. Bartlett, 587 U.S. 391 (2019) is not inferential here — it is supplied by the charging authority's own public declarations: Krasner announced the "state court as federal firewall" strategy publicly on January 5 and January 8–9, then arrested Plaintiff on January 10. Plaintiff is not a January 6 defendant. The relevance is structural: the DA publicly declared that state prosecution would be used to foreclose federal accountability in the precise days he arrested Plaintiff under

a judicial apparatus his own office had simultaneously identified as compromised. These statements collectively support Plaintiff's contention that the office maintained an enforcement posture adverse to protected exposure of official misconduct.

45.    Adam Sequoyah Yee, Esq., in connection with the August 2025 arrest sequence, stated on audio recording that the prosecution was proceeding specifically because 'Brett wants to protect the system' — naming ADA Brett Zakeosian by first name as the supervisory actor directing the retaliatory enforcement posture. This is a recorded identification of a named supervisory prosecutor, cited as corroborative context within an enforcement sequence independently documented in Tier A transcripts. Under Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988), supervisory liability under § 1983 requires personal involvement; Yee's statement supplies corroborative evidence supporting Zakeosian's personal involvement in the enforcement decision against Plaintiff, cited as one of three independent corroborating sources alongside the July 14 transcript and the July 17 charging email. This recording is Exhibit J (Tier C, pending chain-of-custody certification). Separately, Zak Goldstein — retained as Plaintiff's defense counsel — offered ARD on September 19, 2025, then withdrew that offer mid-hearing on October 22, 2025, minutes after opposing counsel Piscopo was copied on a communication that had remained within the attorney-client relationship. Goldstein is not named as a defendant. This sequence is relevant as corroborating pattern evidence: information moved from the defense side to the opposing side at the precise moment the enforcement posture hardened, supporting the inference of a coordination mechanism operating outside adversarial posture. He is a documented coordination node whose conduct is cited as evidence of the information-transmission channel, not as a basis for independent liability.

46.    The Enforcement Escalation Ladder — Overview. The three arrest sequences documented below each follow an identical structural pattern: protected activity by Plaintiff → documented government awareness → enforcement escalation → arrest. Each step is documented by certified transcript, criminal docket, DA institutional filing, or authenticated record. Circuit A governs the August 19, 2025 arrest (Case MC-51-CR-0015343-2025). Circuit B governs the January 10, 2026 arrest (Case MC-51-CR-0000640-2026). Circuit C governs the February 2, 2026 arrest (Case MC-51-CR-0001972-2026). The circuits are pleaded as independent retaliation theories; each is self-sufficient and does not depend on the others.  47.

Circuit A — Surveillance, Recording, and August 2025 Arrest (Steps 1–4): (Step 1) Prior to June 18, 2025 hearings: Cassi Segulin, FJD digital court recorder assigned to Judge Sulman's courtroom, monitored Plaintiff's protected Instagram speech in real time before the June 18 and July 14 hearings — confirmed on the certified July 17 transcript (pp. 18–19, Exhibit L-1, Tier A) and September 22 transcript (pp. 17–24, Exhibit L-2, Tier A). A timestamped screenshot taken at 1:01 PM on July 14, 2025 — during the hearing — shows "Cassi Segulin" by name in Plaintiff's Instagram story viewer list (Exhibit L-4, Tier B). Segulin's LinkedIn profile was erased within 24 hours of being named in the July 14 transcript. (Step 2) June 18, 2025: Plaintiff records in Courtroom 6F to protect record integrity against the surveilling court recorder — protected First Amendment defensive activity. (Step 3) June 18, 2025: Phone seized in Judge

Sulman's courtroom. (Step 3a) Same hearing: Judge Sulman states from the family court bench: "You're going to have to be with a warrant being sworn out. I think that you may have committed a crime here by recording this proceeding." — threatening prosecution and directing that a warrant be sworn out from a civil family court hearing, without charging authority, without referral to law enforcement, and without any finding of probable cause. (June 18, 2025 Certified Transcript pp. 61–63, Exhibit U — Tier A.) The criminal charge for MC-51-CR-0015343-2025 was directed by a family court judge in a civil proceeding, without valid service on Plaintiff, after a court reporter assigned to that judge's courtroom had surveilled Plaintiff's protected speech. (Step 4) June 20–July 17, 2025: Plaintiff asserts whistleblower status in writing on four independent occasions — detailed in Step 4a below. 48. Circuit A — Whistleblower Arc and August Arrest (Steps 4a–6): The 60-day whistleblower assertion arc, each step documented: (a) June 20, 2025 — Plaintiff files "Protected Whistleblower Declaration and Federal Rights Notice" in Family Court, formally asserting whistleblower status (Exhibit Z-5 — Tier A court filing). (b) June 21, 2025 — Plaintiff files Emergency Motion to Recuse Judge Sulman. (c) June 23, 2025 — Plaintiff meets in person with Detective Leonard at DA intake; Leonard confirms: no warrant had been issued, seizure was ordered by Judge Sulman without law enforcement involvement, and Plaintiff "would likely be prosecuted" if a recording is found. (d) June 24, 2025 — Plaintiff sends certified mail to Zakeosian: "Formal Objection to Seizure — Fourth Amendment Violation, Whistleblower Retaliation, and Federal Civil Rights Preservation" asserting whistleblower protected status and citing Riley v. California and 42 U.S.C. §1983 (Exhibit Z-3 — Tier B). (e) July 17, 2025 — Plaintiff emails Zakeosian and Leonard (CC'd directly on email chain) documenting the false probable-cause basis — the policy handout did not exist before June 18, and Sulman confirmed on transcript no sign was posted. Zakeosian responds same day at 1:55 PM: "You are currently under criminal investigation." (Exhibit Z-4 — Tier A email chain.) Leonard is in possession of written documentation of the false probable-cause basis 33 days before executing the August 19 warrant. (Step 5) August 19, 2025: Leonard arrests Plaintiff and searches phone pre-warrant — 60 days after the first formal whistleblower assertion, 33 days after Leonard received written notice of the false probable-cause basis. (Step 6) September 19, 2025: ARD offered by defense counsel Goldstein. October 22, 2025: ARD retracted mid-hearing after privileged information transmitted to opposing side. 18 U.S.C. §1513 (cited as evidence of the protected nature of Plaintiff's whistleblower activity, not as an independent civil cause of action — the civil claim arises under 42 U.S.C. §1983); Franks v. Delaware, 438 U.S. 154 (1978); Nieves v. Bartlett, 587 U.S. 391 (2019). 49.    Circuit B — Inauguration, FAFO, and January 2026 Arrest (Steps 6b–8): (Step 6b) January 5, 2026 — Kimmel Center inauguration: DA Krasner is sworn in alongside 34 elected and retained judges including confirmed retention winners Judges Papademetriou and Olszewski (Philadelphia Tribune, January 6, 2026 — Tier A). Plaintiff publicly boos Krasner at introduction and departure — protected First Amendment political speech (Video — Exhibit AA, Tier B). (Step 6c) January 8, 2026 — Judge Pittman presides over a defective-notice hearing in Case -0015343 at which Plaintiff received no constitutionally adequate notice and no counsel appeared on his behalf. Bench warrant issues (Criminal Docket — Tier A). On the same day: DA Krasner and Sheriff Bilal hold a joint press conference at which Krasner publicly declares: "If any law enforcement agent, any ICE agent is gonna come to Philly…

I will charge you with those crimes. You will be arrested. You will stand trial. You will be convicted. Donald Trump cannot pardon you for a state court conviction. Do you hear me?" (Billy Penn, January 8, 2026; Exhibit KRASNER-2 — Tier A.) This statement — delivered publicly two days before Plaintiff's arrest — establishes that the DA's office was running an explicit "state court as federal firewall" enforcement strategy in the precise window Plaintiff was arrested. Williamson emails "we will be coming in" (CC: Weisgold) — same documented pattern as January 29. (Step 6d) January 10, 2026 — same day as arrest: DA Krasner publishes two Instagram posts to verified @larrykrasner: the "FAFO" sunglasses post and "I said what I said" (Exhibit X — Tier B, January 10, 2026) — five days after Plaintiff booed him at the inauguration, same day his office arrested Plaintiff. (Step 7) January 10, 2026, 12:15 PM: Killman and Davis arrest Plaintiff; door kicked in without announcement; Plaintiff physically choke-slammed; held approximately 72 hours total; phone access denied 48+ hours (ferrari_tribunal Instagram story, January 13, 2026, 10:55 AM — Tier B). (Step 7a) January 29, 2026 — Sulman self-assigns to Case -0640 the same day Williamson physically blocks Plaintiff from his residence and, on video, taunts that "cops" are coming (Exhibit Y-6 — Tier B). The warrant for Case -0001972 was not created until January 30, 2026 — confirmed by Sheriff's deputies during February 2 transport. Williamson's video taunt predating the warrant by one day, on the same day Sulman performed his unauthorized self-assignment, supports the reasonable inference that Williamson possessed advance knowledge of the enforcement timeline through his coordination channel with the judicial apparatus — not from public information. Nieves v. Bartlett, 587 U.S. 391 (2019); Hartman v. Moore, 547 U.S. 250 (2006). 50.    Circuit C — Brady Suppression, Nelson Hallway, and February 2026 Arrest (Steps 8–11): (Step 8) January 13, 2026: (a) Plaintiff, upon release, publicly documents on @ferrari_tribunal the Sulman-Williamson coordination and tags @larrykrasner and @rochellebilal directly — multiple posts beginning 8:33 AM (ferrari_tribunal, January 13, 2026 — Tier B); (b) ADA Vincent Corrigan files DA motion naming Judge Sulman as a material witness (DA Certification of Service, Exhibit K — Tier A). The DA's own office names the presiding judge in the same pro se litigant's case as a material witness on the same day Plaintiff publicly documents the coordination. The motion is then suppressed for twenty days. (Step 9) January 29, 2026: Sulman self-assigns to Case -0640 — 91 days post-recusal — docket entry labeled "Court Request For Continuance Judicial Recusal" filed by "Sulman, Daniel" (Criminal Docket — Tier A). (Step 10) February 2, 2026: Public defender Nelson discloses the suppressed DA motion in a courthouse hallway minutes before a scheduled hearing. Officer Scarpello entered the courtroom and arrested Plaintiff publicly before assembled court participants — within five minutes of the hallway disclosure — on Case -0001972. The public nature of the arrest, performed before an audience in a courthouse setting consistent with Sulman's prior documented pattern of public courtroom enforcement spectacle, is itself a separately cognizable constitutional injury. (Step 11) March 2, 2026: Both criminal cases are routed to Room 406 — the Philadelphia mental health diversion court — without a judge listed, without service to Plaintiff, run through Microsoft Teams — a platform the Office of Court Reporters confirms in writing it does not use: "We definitely don't handle anything on Teams" (Kearney email, March 3, 2026, Exhibit V — Tier A). Critically: Plaintiff had previously terminated Brian Johnson of the Defender Association as counsel. Johnson appeared at the March 2 Teams

proceeding without Plaintiff's knowledge, without Plaintiff's consent, and without any authorized representation agreement — purportedly "assigned by default." Johnson's only communication to Plaintiff was an after-the-fact email informing him that his "presence was waived" and scheduling a future court date — without Plaintiff's participation in either the proceeding or the scheduling decision. Under Pennsylvania Rule of Criminal Procedure 602 and Faretta v. California, 422 U.S. 806 (1975), a defendant's right to be present at a criminal proceeding cannot be waived by counsel without the defendant's knowing and voluntary consent. No such consent was given or sought. When Plaintiff subsequently asked Johnson about the circumstances of the Room 406 proceeding, Johnson blocked Plaintiff on Instagram while remaining officially listed as active counsel on three pending criminal cases — a documented act of consciousness of guilt corroborating the inference that Johnson knew the proceeding was constitutionally defective. The combination of: (a) no record (Kearney Tier A); (b) unauthorized attorney appearance by a counsel who had been fired; (c) presence waived without consent; (d) after-the-fact notice only; and (e) attorney blocking client upon questioning — makes the March 2 Room 406 proceeding void under Pa.R.Crim.P. 602 and Vitek v. Jones, 445 U.S. 480 (1980), and any order, scheduling decision, or directive emerging from it without legal foundation. The Room 406 routing is the enforcement apparatus's final attempt to continue the deprivation of Plaintiff's liberty through a non-judicial mechanism after the original enforcement pathway had been exposed. Steps 45–49 are each pleaded as independent corroborating circuits supporting a retaliatory inference that cannot be resolved without discovery. Nieves v. Bartlett, 587 U.S. 391 (2019); Fields v. City of Philadelphia, 862 F.3d 353 (3d Cir. 2017).  51. Sheriff Rochelle Bilal is the elected Sheriff of Philadelphia County and the final policy-making official for a department whose personnel (Lt. Johnson, Badge 105) physically removed Plaintiff from the courthouse in documented retaliatory circumstances. Sheriff Bilal made public statements on television and through social media indicating she had awareness of Plaintiff's civil rights complaints against her department and indicating she was not concerned.

52.    Sheriff Bilal blocked Plaintiff from the official Philadelphia Sheriff's Department social media accounts. When a government official uses an official social media account as a public forum and then blocks a specific individual based on that individual's civil-rights complaints or litigation against the official's department, the blocking constitutes viewpoint discrimination and retaliation. Davison v. Randall, 912 F.3d 666 (4th Cir. 2019). This claim is narrow: it goes to Sheriff Bilal's official-capacity conduct and the Sheriff Department's customs, not to social media use generally.

## VIII. Richard Williamson as Private State Actor

53.    Richard Williamson's documented overt acts are grouped below into three phases showing the trajectory of his alleged coordination with state enforcement actors. Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982); Dennis v. Sparks, 449 U.S. 24 (1980). PRE-ARREST PREPARATION (December 29, 2025 – January 9, 2026): (1) Retained attorney Dean Weisgold on December 29, 2025 — eleven days before the

January 10 arrest — establishing civil legal infrastructure aligned with the expected enforcement window; (2) Text communications referencing Julie Ferrari and Judge Sulman regarding Plaintiff's circumstances, followed by Julie Ferrari's contact with Patricia Ferrari regarding rent; (3) Weisgold's pre-arrest written communication to Patricia Ferrari referencing property matters before any court order authorized action — supporting the inference that enforcement and property recapture were being coordinated in advance; (4) January 9, 2026 — one day before the arrest — Williamson threatened on video to bring police to the property. (Exhibit Y-1 — Tier C.)  ARREST-WINDOW COORDINATION (January 10-12, 2026): (5) January 10, 2026 — on video, Williamson attempted to enter the property without authorization concurrent with the criminal arrest of Plaintiff by Killman and Davis. (Exhibit Y-2 — Tier C.) Separately, video evidence shows Williamson present in the building at the time of the officers' entry, supporting the inference — subject to confirmation through discovery of building access logs and body-camera footage — that Williamson provided entry access to the building concurrent with the arrest. The simultaneity of the criminal arrest and the property-access attempt supports the reasonable inference of joint action; (6) Physical abuse of Patricia Ferrari between January 10-12, 2026, during the arrest window — including Williamson's attempts to lock her out and remove Plaintiff's property while Plaintiff was in custody. POST-ARREST PROPERTY EXPLOITATION AND CONTINUED COORDINATION (March 2026): (7) March 1, 2026 — the same date both criminal dockets were routed to Room 406 without notice to Plaintiff — Williamson texted Patricia Ferrari asking "Is Chad back in jail?" while stating he was "moving in tomorrow." Real-time awareness of enforcement developments, timed to a void court proceeding, supports an inference of continued coordination; (8) March 3, 2026 lockout of Plaintiff without court order; (8a) January 10, 2026 — 12:15 PM: Philadelphia police and Sheriff's deputies, coordinated by Williamson, entered Plaintiff's residence at 1119 Wallace Street without announcement, kicked in the door, physically choke-slammed Plaintiff against the wall. No announcement of identity, purpose, or authority was made before forced entry. (b) January 10, 2026 — 12:20 PM: Williamson himself appears on video at the property five minutes AFTER police and Sheriff's deputies had already entered and executed the arrest — claiming he was there to "return keys." Plaintiff had emailed Weisgold specifically requesting that Williamson provide two available dates/times with a third-party chaperone before any property entry. (Video — Exhibit Y-2, January 10, 2026, 12:20 PM.) Critically: Williamson had covertly entered the property the night before January 10 to steal Chad's keys — then arrived with the stolen keys as his cover story for being present during the coordinated arrest. The sequence — advance key theft, police entry at 12:15 without announcement, Williamson arrival at 12:20 with stolen keys — supports the reasonable inference of advance coordination between Williamson and the law enforcement actors who executed the arrest. (c) January 8, 2026 — the same day as the Pittman defective-notice bench warrant hearing and the Krasner-Bilal joint press conference: Williamson emails Plaintiff (CC: Weisgold) at 1:15 PM: "Chad. I am not routing inspection requests through counsel. We will be coming in as I noted." (Exhibit Y-5 — Tier A email, authenticated by header: Richard Williamson (richard_williamson03@yahoo.com), January 8, 2026, 1:15 PM.) On the same day that a defective-notice warrant was generated in Plaintiff's criminal case and Krasner and Bilal held a joint press conference, Williamson made a unilateral property-entry demand in

defiance of Plaintiff's counsel-routing request — three days after Plaintiff publicly booed Krasner at the January 5 inauguration. January 8, 2026 is a key convergence date in the documented enforcement timeline, with five simultaneous enforcement and coordination events: five simultaneous enforcement and coordination events — (1) Pittman defective-notice bench warrant hearing; (2) Williamson's unilateral "We will be coming in" email (CC: Weisgold, 1:15 PM); (3) Krasner-Bilal joint press conference declaring state prosecution as a federal firewall; (4) two unserved bench warrants generated; and (5) Weisgold's pre-arrest written communication to Patricia Ferrari referencing property matters — all on the same calendar date, two days before the January 10 arrest and five days after Plaintiff publicly booed Krasner. The convergence of five independent enforcement and coordination events on a single date supports the inference of coordinated enforcement activity; (9) January 13, 2026 texts from Williamson to Patricia Ferrari: "The police kicked in the door and damaged it, what are you missing?" — Williamson's own admission that police forcibly entered the property during the arrest, published in Plaintiff's Instagram story three days post-arrest (@rich.williamson.215, documented ferrari_tribunal January 13, 2026 10:37 AM — Tier B); (10) March 12, 2026 — Praecipe to Discontinue filed the same day Garcia hearing compelled key return, supporting an inference of abuse of process; (10) March 16, 2026 gym locker-room confrontation, captured on video.

54.     Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982); Dennis v. Sparks, 449 U.S. 24 (1980) (private party who conspires with state actor to deprive constitutional rights acts under color of state law). Williamson used the state warrant and court apparatus as instruments of retaliation in coordination with the judicial and enforcement actors named in Track 1 and this complaint.

## CAUSES OF ACTION

### COUNT I — FOURTH AMENDMENT: WARRANTLESS SEARCH OF CELL PHONE
(Against Leonard, Does 1-10, City of Philadelphia)

55.     Plaintiff incorporates all prior paragraphs. Defendant Leonard searched Plaintiff's cell phone incident to arrest without a warrant. Riley v. California, 573 U.S. 373 (2014). No exigency, officer-safety concern, or destruction-of-evidence basis existed justifying a warrantless digital search. The violation is per se. Leonard is not entitled to qualified immunity as this rule was unambiguously established. Plaintiff suffered invasion of digital privacy; exposure of privileged communications; and downstream prejudice to all pending legal proceedings through the compromised device. Leonard's own pre-arrest recorded statements from approximately August 7, 2025 — twelve days before the arrest — further document: (a) that phone data including year-old text messages was accessed on approximately July 11–12, 2025 — simultaneously with Plaintiff's iCloud discovery that 19 iMessages had disappeared — establishing phone

access before any confirmed search warrant; (b) that "Brett was the one that signed off on it" — Zakeosian personally authorized the warrant application; and (c) that Lt. Johnson ("the sheriff") was the source of the false signage representation that formed the warrant's probable-cause foundation — confirming Johnson lied to Leonard, Leonard passed the lie to Zakeosian, and Zakeosian built the prosecution on it.

## COUNT II — FOURTH AMENDMENT: FALSE ARREST / WRONGFUL IMPRISONMENT (THREE ARRESTS)
(Against Leonard, Killman, Davis, Corrigan, Does 1-10)

56. Plaintiff incorporates all prior paragraphs. This count addresses the absence of probable cause for each arrest, independent of retaliatory motive. Each arrest was made on a warrant predicated on materially false or fraudulent information. The recording charge warrant (Arrest 1) is subject to suppression under Franks v. Delaware, 438 U.S. 154 (1978): Lt. Johnson's statement to Leonard that prohibition signs were posted in the courtroom was materially false, as confirmed by: (1) Judge Judge Sulman's own on-record statement on the certified July 14, 2025 hearing transcript — when Plaintiff asked directly where the sign was — that he "didn't know" whether a sign was posted and that it "doesn't matter," confirming that the presiding judge himself could not verify the existence of the sign that formed the core probable-cause premise of the warrant affidavit; (2) the fact that a new cell phone policy handout only appeared for the first time on July 14, 2025 — 26 days after the arrest; and (3) Zakeosian's issuance of the arrest warrant on the same day Plaintiff documented and communicated this discrepancy directly to Zakeosian. A warrant issued on a deliberately false probable-cause statement — that signs were posted when they were not — is void under Franks and any arrest thereon is a Fourth Amendment violation. The contempt arrests (Arrests 2 and 3) rest on a PFA filed for residential possession (Vidas on-record admission), authorized by a judge later arrested for the predicate conduct (Fanning), making those warrants equally void under Malley v. Briggs, 475 U.S. 335 (1986). An officer who obtains or executes a warrant based on an affidavit he knows to be materially deficient is not entitled to qualified immunity. Each Fourth Amendment violation alleged herein is independently actionable regardless of the validity of any underlying charge. Plaintiff suffered three periods of wrongful detention, compounded economic harm, and loss of parental access.

## COUNT III — FIRST AMENDMENT: RETALIATORY PROSECUTION / VIEWPOINT DISCRIMINATION
(Against Leonard, Killman, Zakeosian, Krasner, Bilal in official capacity)

57. Plaintiff incorporates all prior paragraphs. This count addresses enforcement action taken because of Plaintiff's constitutionally protected activity: recording to document court misconduct in response to documented government surveillance of his speech; filing civil rights complaints and motions; and exposing

judicial misconduct through pro se litigation. This case presents three distinct but interlocking First Amendment and whistleblower retaliation engines operating simultaneously: (1) whistleblower retaliation — Plaintiff's August 18-19, 2025 email to ADA Zakeosian asserting federal protected whistleblower status and documenting constitutional rights violations was answered the same day with the August 19 arrest warrant; this constitutes retaliation against a person who provided information about a federal offense to a law enforcement officer, cognizable under both 42 U.S.C. § 1983 and 18 U.S.C. § 1513 (cited as evidence of the protected nature of the whistleblower activity, not as an independent civil cause of action — the civil claim arises under 42 U.S.C. §1983); (2) classic retaliation for protected speech and petitioning activity — including Plaintiff's public criticism of DA Krasner at the January 5, 2026 Kimmel Center joint inauguration ceremony (booing at introduction and departure while Krasner made repeated eye contact), followed two days later by a defective-notice warrant hearing and four days later by arrest — a temporal sequence that supports the reasonable inference of retaliatory motive as one of multiple corroborating data points — and each subsequent arrest following a discrete act of Plaintiff's protected exposure of judicial misconduct; and (3) surveillance-triggered retaliation — government employee monitoring of Plaintiff's protected speech, followed by criminalization of Plaintiff's protective recording response to that surveillance. All three engines are independently actionable. Engines 1 and 3 converge in the Segulin-to-Leonard pipeline for the August 19 arrest. Engine 2 operates independently for the January 10 arrest. The surveillance-to-prosecution pipeline documented in Anchor D — government employee monitoring protected speech → Plaintiff records to protect record integrity → government seizes phone → government arrests Plaintiff for recording — supports a First Amendment retaliation claim. Sheriff Bilal's blocking of Plaintiff from official department accounts constitutes viewpoint discrimination on a government-created public forum. Plaintiff had specifically tagged @rochellebilal by Instagram handle in multiple January 13, 2026 Instagram story posts documenting his arrest and detention — including the post captioned "Look what Larry posted the second I got arrested" and a post-release mirror selfie tagging both @larrykrasner and @rochellebilal simultaneously (ferrari_tribunal, January 13, 2026, 10:49 AM and 11:10 AM — Tier B). Bilal's subsequent blocking of Plaintiff from official Sheriff's Department accounts is viewpoint discrimination targeting the specific individual who publicly documented her office's conduct and tagged her by name. The allegations plausibly support a causal connection between Plaintiff's protected activity and the enforcement actions, evidenced by the following: (a) Krasner's 'FAFO' public post contemporaneous with Plaintiff's arrest; (b) Yee's recorded statement that the prosecution was proceeding specifically because 'Brett wants to protect the system' — naming Zakeosian directly; (c) Goldstein's ARD retraction mid-hearing after privileged information was transmitted to opposing counsel; (d) the July 14, 2025 certified transcript showing Judge Sulman confirming Zakeosian's role as case handler from the family court bench; and (e) Yee's disclosed prior working relationship with Zakeosian on a prior law enforcement matter in Northeast Philadelphia — a professional relationship built within the same prosecutorial ecosystem. The precise temporal alignment of each enforcement escalation with Plaintiff's moments of maximum protected activity plausibly supports a retaliatory inference that cannot be resolved at the pleading stage. Each escalation followed a discrete act of protected activity within a short temporal window. Nieves v. Bartlett, 587 U.S. 391 (2019); Hartman v.

Moore, 547 U.S. 250 (2006); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Fields v. City of Philadelphia, 862 F.3d 353 (3d Cir. 2017).

## COUNT IV — FOURTEENTH AMENDMENT: BRADY SUPPRESSION

(Against Corrigan, Zakeosian, Krasner in official capacity, Does 1-10)

58. Plaintiff incorporates all prior paragraphs. The DA's January 13, 2026 motion naming Judge Sulman as a material witness is Brady material. It was directly relevant to Plaintiff's ability to challenge the constitutional validity of all three pending criminal proceedings, raise conflict-of-interest arguments, and make informed decisions about voluntary court appearances. Three attorneys across the DA's Office and the Defender Association held this information for twenty days. The disclosure was made minutes before Plaintiff's third arrest — ensuring Plaintiff could not act on it before being taken into custody. This is institutional, not accidental, suppression. The suppression deprived Plaintiff of the opportunity to seek pretrial relief, including bail modification, suppression motions, recusal applications, and informed decisions regarding voluntary appearance versus warrant execution — independent constitutional injuries completed before any trial. Had the January 13, 2026 motion been disclosed when filed, Plaintiff would have immediately sought bail modification, prosecutorial recusal, and conflict-based suppression relief — all foreclosed by the twenty-day suppression. The disclosure obligation is completed and the injury is not speculative: the twenty days of suppression culminated in a third arrest while the Brady material sat in three attorneys' possession. Brady v. Maryland, 373 U.S. 83 (1963); Strickler v. Greene, 527 U.S. 263 (1999).

## COUNT V — GIGLIO / BRADY: PROSECUTORIAL CONFLICT NON-DISCLOSURE

(Against Corrigan, Zakeosian, Krasner in official capacity)

59. Plaintiff incorporates all prior paragraphs. The DA's Office failed to disclose the structural conflict identified in paragraphs 41–43: that ADA Eleni Papademetriou Belisonzi Fritze — assigned to the Family Violence and Sexual Assault Unit, the specific unit responsible for processing PFA contempt charges of the category charged against Plaintiff — is the daughter of Judge Ourania Papademetriou, who issued the jurisdictional predicate order for Case -0001972. This non-disclosure is a constitutional violation independent of whether Eleni Fritze personally participated in any charging decision. The disclosure obligation attached by operation of the structural conflict: the judge and the prosecuting unit were linked by immediate family, and that fact was material to the integrity of the prosecution. Under Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963), material information bearing on the institutional objectivity of prosecutorial decision-making must be disclosed. Its suppression deprived Plaintiff of the ability to seek prosecutorial recusal, challenge the predicate order, seek bail reduction, or use the conflict in any pretrial proceeding — causing completed constitutional injuries independent of any

trial outcome. The significance of this non-disclosure is compounded by a documented surveillance fact: Plaintiff publicly named Judge Papademetriou on his @ferrari_tribunal Instagram account during the period the DA's own surveillance of that account was active — established by Segulin's pre-hearing monitoring in the same pipeline documented in Anchor D. The DA's office was therefore on contemporaneous notice that Plaintiff was publicly exposing the judicial fraud that implicated a colleague's parent, at the precise moment ADA Zakeosian received Plaintiff's disclosure and escalated to arrest. Whether Eleni Fritze, William Fritze III, or any other family-connected actor participated in, was consulted about, or was informed of any charging decision affecting Plaintiff is a factual question for discovery and is pleaded on information and belief.

## COUNT VI — MONELL: MUNICIPAL LIABILITY

(Against City of Philadelphia, Krasner in official capacity, Bilal in official capacity)

60.     Plaintiff incorporates all prior paragraphs. The City of Philadelphia maintains two documented municipal policies, customs, and practices that independently enabled each constitutional violation alleged herein. Each bucket is independently sufficient to sustain Monell liability and does not depend on proof of the other. Monell v. Department of Social Services, 436 U.S. 658 (1978). Bucket One — Police and Sheriff Department Failures (City of Philadelphia): (a) Failure to train on Riley v. California cell-phone search requirements. Detective Leonard's own recorded admission of a pre-warrant phone search on August 19, 2025 demonstrates a training failure "so obvious as to constitute deliberate indifference" to the Fourth Amendment rights of persons arrested in Philadelphia. City of Canton v. Harris, 489 U.S. 378 (1989). The failure is specific, documented by the arresting officer's own audio admission, and resulted in a per se constitutional violation. The officer documented the training failure on his own audio recording.  (b) Custom of courthouse-based viewpoint discrimination and retaliatory removal. Lt. Barry Johnson (Badge 105) physically removed Plaintiff from the Family Law courthouse on documented occasions, video evidence preserved for subpoena. Sheriff Bilal blocked Plaintiff from official Sheriff's Department social media platforms after Plaintiff tagged her verified account documenting his January 10 arrest — viewpoint discrimination on a government-created public forum. Both acts are documented by video and platform records and reflect a municipal custom of retaliatory courthouse conduct directed at civil rights litigants documenting official misconduct.  Bucket Two — District Attorney's Office Failures (City of Philadelphia): (c) Failure to institute conflict-of-interest protocols after the DA's own office named a sitting judge as a material witness. The DA's January 13, 2026 motion (ADA Vincent Corrigan) naming Judge Sulman as a material witness created an institutional conflict that the DA's office then ignored for twenty days while suppressing the filing from defense counsel. No conflict protocol was triggered. No recusal or reassignment of prosecution occurred. The twenty-day suppression and the February 2 arrest that followed are the direct documented consequences of this institutional failure. This is not a general failure-to-train theory — it is a specific, documented failure to act on a conflict that the DA's own institutional filing

created. (d) Failure to disclose prosecutorial family conflicts and custom of routing prosecutions through unofficial non-recordable channels. The Papademetriou family conflict — Judge Papademetriou's daughter holding an active position in the Family Violence Unit that processes charges arising from her mother's own predicate order — was never disclosed, preventing Plaintiff from seeking pretrial disqualification or recusal. Whether Eleni Fritze directly participated in any charging decision is for discovery; the non-disclosure obligation attached by operation of the structural conflict itself and is independently actionable regardless of direct involvement. Additionally, the routing of both criminal dockets on March 2, 2026 to Room 406 through Microsoft Teams — a platform the Office of Court Reporters confirms in writing it does not use for judicial proceedings (Kearney email, Exhibit V — Tier A) — demonstrates a municipal custom of using unofficial, non-recordable channels to exercise criminal jurisdiction while avoiding the creation of an official record. These two failures operated simultaneously: undisclosed family conflict in the prosecution combined with unofficial channel routing to avoid oversight. (e) Custom of deliberately defective notice designed to generate bench warrants against unrepresented defendants. Three documented instances across eight months: (i) June 18, 2025 — service on withdrawn counsel Pagnanelli, ten days after documented withdrawal; (ii) December 3, 2025 — morning-of forwarded notice through withdrawn attorney Goldstein's unknown paralegal, sent 109 minutes before hearing, to junk mail folder; (iii) January 8, 2026 — same-day notice from SIU detective Jeter (Zakeosian's unit) while Plaintiff was out of town. Each instance followed an identical structural pattern: route notice through a channel Plaintiff cannot access → generate non-appearance → issue bench warrant. Three instances constitutes a custom or practice under Monell. Plaintiff had previously documented this pattern in writing to Zakeosian and Goldstein — notice that was received and ignored — before the third instance occurred. 61. The independent case of Eugene Dykes Sr. (EDPA 2:25-cv-06348-MRP, filed November 10, 2025) names the same actors and documents the same pattern of warrant abuse by an entirely unaffiliated pro se litigant with no connection to Plaintiff. Three unconnected litigants independently documenting the same pattern from the same actor — Dykes (EDPA 2:25-cv-06348-MRP), Brandon Fake (Third Circuit No. 25-1798, naming Sulman, Murphy, and Botchway), and Plaintiff — constitutes custom or practice evidence. The recurrence of identical conduct across independent, unrelated litigants is the Monell standard: not isolated incidents, but systemic policy. The recurrence of identical conduct across independent cases by unrelated litigants demonstrates that the constitutional failures were not isolated incidents but systemic policies, customs, or practices of the City and its agencies — precisely the municipal liability standard under Monell. Monell, 436 U.S. at 694.

## COUNT VII — § 1983 CONSPIRACY: PRIVATE STATE ACTOR
(Against Williamson, coordinating defendants, Does 1-25)

62.    Plaintiff incorporates all prior paragraphs. Richard Williamson conspired with state actors — using the state warrant and court apparatus as instruments of retaliation — through the seven documented overt acts described in paragraph 53. His joint action with the enforcement apparatus under color of state law

renders him a state actor for § 1983 purposes. Williamson's conduct depended upon and tracked the execution of state enforcement actions: without the warrant apparatus, the bench warrant coordination, and the court-facilitated eviction proceedings, the deprivation could not have been accomplished. Three facts independently and collectively elevate Williamson beyond parallel conduct into documented joint-action territory. First, on December 9, 2025 — before his December 29 retention of Weisgold and before the January 10 arrest — Williamson sent Plaintiff a text message stating: "Got you man! Should i try to talk to sulman first?" (Exhibit Y-4 — Tier B text message screenshot.) This text establishes that Williamson possessed and offered to activate a direct communication channel to the presiding judge in Plaintiff's active family court proceedings — a channel that Williamson himself acknowledged by name. The word "first" implies sequencing: he was contemplating judicial contact as a preliminary step in a coordinated plan. A landlord does not have a direct line to a sitting Family Court judge absent a prior relationship. Second, on December 6, 2025 — before that text — Williamson volunteered to Plaintiff a case-specific probabilistic assessment: "I got your chances at 30% but praying you get your kids back." A landlord with no legal training and no access to family court records cannot independently assess a pending custody proceeding's probable outcome unless someone with inside knowledge of the proceedings shared that assessment with him. The only person with both the motive and the judicial access Williamson himself identified was Judge Sulman. Third, Williamson retained Weisgold on December 29, 2025 — 20 days after asking whether to contact Sulman directly. The professionalization of an informal judicial contact inquiry into a retained-attorney relationship, with an attorney documented in the complaint as having network ties to FJD actors, is the conversion of informal coordination into institutional coordination. This allegation is pleaded as evidence of a proposed channel of judicial contact and subsequent coordinated conduct, not as a claim that such contact occurred absent discovery. Additional corroboration that the channel was activated before December 9: in early December 2025, Plaintiff's mother Patricia Ferrari was contacted by opposing party Julie Ferrari asking about Plaintiff's rent status at 1119 Wallace Street — information only Williamson could have provided to Julie, establishing that a Williamson-Julie communication had already occurred before Williamson's December 6-9 texts to Plaintiff. The information flow runs: Williamson communicates rent information to Julie $\rightarrow$ Julie contacts Patricia $\rightarrow$ Patricia tells Plaintiff. This reverse-engineered communication chain documents that Williamson was already feeding information to the opposing party before he asked whether to contact Sulman directly. Under Dennis v. Sparks, 449 U.S. 24 (1980), a private party who conspires with a judicial officer to deprive a person of constitutional rights is a state actor under §1983. The following facts, taken together, plausibly support actual joint action rather than mere parallel conduct: (1) December 6, 2025: Williamson provides Plaintiff a case-specific 30% custody probability — inside judicial knowledge he could only have received from someone in the proceedings. (2) December 9, 2025: Williamson asks Plaintiff "Should i try to talk to sulman first?" — documenting an established judicial access channel by name. (3) January 8, 2026: Williamson emails "We will be coming in" — the same day as the Pittman bench warrant hearing, the Krasner-Bilal joint press conference, and Plaintiff's request for counsel-routed entry. (4) January 10, 2026: Police and Sheriff enter at 12:15 without announcement, kick the door, physically assault Plaintiff. Williamson arrives five minutes later at 12:20

with stolen keys as a cover story — having covertly entered the night before to take them. These facts support the reasonable inference of coordination between Williamson and the law enforcement actors involved.   (5) January 29, 2026 — Two things occurred simultaneously on January 29 — the same day Sulman self-assigned to Case -0640. First, Williamson emailed Plaintiff (CC: Weisgold) at 11:55 AM: "If you do not provide access within the timeframe stated above, we will exercise our right to enter the unit at a date and time that is reasonable and convenient for us." (Exhibit Y-6 — Tier A email, January 29, 2026, 11:55 AM, CC: Dean Weisgold.) Second, Williamson was physically present at 1119 Wallace Street, refused Plaintiff entry to his own home, and — on video — repeatedly taunted Plaintiff, bragging that cops were coming and directing Plaintiff to "check your email" — an identical pattern to January 8, when the "we are coming in" email (CC: Weisgold) preceded the January 10 coordinated forced police entry by two days. (Exhibit Y-6 video — Tier B.) The warrant for Case -0001972 was not created until January 30, 2026 — confirmed by Sheriff's deputies who informed Plaintiff during February 2 transport. Williamson taunted Plaintiff about cops on January 29 before any warrant existed. The documented "we" pattern: January 8 email "we are coming in" (CC: Weisgold) + two days later coordinated forced entry; January 29 email "we will exercise our right to enter" (CC: Weisgold, same pattern) + video bragging about cops + warrant created next day. The identical signature — Weisgold-CC'd "we" entry email plus in-person taunting about imminent police action — repeated across two separate enforcement dates is the evidence supporting the inference of Williamson's advance knowledge of coordinated enforcement. (6) The information relay chain is independently confirmed: in early December 2025 — before Williamson's December 6-9 texts — opposing party Julie Ferrari contacted Plaintiff's mother Patricia asking about Plaintiff's rent status. Rent information flows: Williamson knows it, Julie asks about it. The only source is Williamson. The Williamson-Julie communication predates his documented texts to Plaintiff and establishes the relay network: Williamson → Julie → Sulman network, or Sulman network → Julie → Williamson. These six facts, the last of which establishes advance judicial knowledge before a warrant existed, plausibly support actual joint action — not parallel conduct — at the pleading stage. Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982); Dennis v. Sparks, 449 U.S. 24 (1980).

## COUNT VIII — EVIDENCE DESTRUCTION: TROMBETTA / YOUNGBLOOD
(Against Leonard, City of Philadelphia)

63.    Plaintiff incorporates all prior paragraphs. The phone was seized at the June 18, 2025 Sulman hearing and has never been returned. On the Thursday night before the July 14, 2025 hearing — while the phone remained in law-enforcement custody — 19 iMessages that had been present and unread disappeared from Plaintiff's iMessage account, discovered via iCloud sync on a replacement device. The selective disappearance of 19 messages on the eve of a specific hearing — the hearing at which Plaintiff had placed Segulin's government surveillance conduct on the record — rather than random data loss, raises the inference of bad faith required under Arizona v. Youngblood, 488 U.S. 51 (1988). Under California v.

Trombetta, 467 U.S. 479 (1984)'s lower standard, the destroyed messages possessed apparent exculpatory value before destruction. Plaintiff specifically suffered: loss of communications documenting the government surveillance that provoked the protective recording; loss of communications with counsel documenting the case posture before seizure; and loss of business records relevant to the concurrent economic harm. Plaintiff seeks forensic accounting, SHA-256 chain-of-custody certification from date of seizure through present, and damages for permanent evidentiary prejudice.

## EVIDENCE MATRIX — CLAIM TO EXHIBIT MAP

Tier A: certified transcripts, docket entries, DA's own institutional filings, public records. No Tier A claim requires the Court to accept any unverified allegation.

| CLAIM/COUNT | DEFENDANTS | KEY FACT ANCHOR | TIER | CASE LAW |
|---|---|---|---|---|
| Count I — 4th Amend. Warrantless Phone Search | Leonard, City | Pre-warrant search admitted on audio; 19 iMessages missing; no SHA-256 return | A/C | Riley v. California, 573 U.S. 373 (2014) |
| Count II — 4th Amend. False Arrest (x3) | Leonard, Killman, Davis, Corrigan | Void PFA predicate chain; Vidas p.15 on-record admission; Fanning arrest 3/10/26 | A | Malley v. Briggs, 475 U.S. 335 (1986); Manuel v. Joliet |
| Count III — 1st Amend. Retaliatory Prosecution | Leonard, Killman, Zakeosian, Krasner | Surveillance → recording → seizure chain (Segulin/June 18); FAFO post; Yee: &#x2018;Brett wants to protect the system&#x2019;; Goldstein ARD retraction timing | A/B/C | Nieves v. Bartlett, 587 U.S. 391 (2019) |
| Count IV — 14th Amend. Brady Suppression | Corrigan, Zakeosian, Krasner (policy) | DA motion naming Sulman received Jan 13; suppressed 20 days; disclosed min. before Arrest 3 | A | Brady v. Maryland; Strickler v. Greene |
| Count V — Prosecutorial Conflict Non-Disclosure | Corrigan, Zakeosian, Krasner | Papademetriou's daughter Eleni = ADA Family Violence Unit, same office prosecuting Chad | A (pub rec) | Giglio v. U.S., 405 U.S. 150 (1972); Brady |
| Count VI — Monell Municipal Liability | City of Philadelphia, Krasner, Bilal | Riley training failure; conflict protocols absent; Bilal official blocking; Dykes parallel case | A/B | Monell v. Dept of Soc. Svcs., 436 U.S. 658 (1978) |
| Count VII — §1983 Conspiracy / Private State Actor | Williamson + coordination | Weisgold retained Dec. 29; lockout Jan. 10 = arrest day; Praecipe/Garcia same day; gym video | B | Lugar v. Edmondson Oil, 457 U.S. 922 (1982) |
| Count VIII — Evidence Destruction / Trombetta | Leonard, City | 19 iMessages missing; no chain-of-custody cert; Trombetta/Youngblood preservation failure | C→A | Trombetta, 467 U.S. 479; Youngblood, 488 U.S. 51 |

## **RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

64.     DECLARE that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

65.     ORDER the Philadelphia Police Department to return Plaintiff's cell phone with SHA-256 chain-of-custody verification, a full forensic accounting for all 19 missing iMessages identifying when and how they were deleted, and certification that no further copies of the phone's contents have been retained or distributed.

66.     ORDER all Defendants to immediately preserve all text messages, emails, CAD reports, internal memoranda, and social media records referencing Plaintiff, the three criminal dockets, the PFA proceedings, or the warrant applications from December 2024 forward.

67.     ORDER production by the DA's Office of all internal communications regarding the three criminal dockets, the January 13, 2026 motion, any communications between the DA's Office and any judicial officer or their staff concerning Plaintiff, and all materials relating to the Papademetriou family conflict.

69.     GRANT declaratory relief that the three arrests, the warrantless phone search, the twenty-day Brady suppression, the prosecutorial conflict non-disclosure, and the official social-media blocking each violated the Constitution as set forth herein.

70.     Damages. As a proximate result of the constitutional violations alleged herein, Plaintiff has suffered the following specific, documented, ongoing injuries. Each category is independently compensable. Together they establish damages of at least $2,000,000 before any punitive award.  (a) Lost Income — Complete Business Destruction: Plaintiff operated active businesses generating income prior to May 2025. As a direct and proximate result of three arrests, sustained reputational harm, seizure and non-return of business phone and records, and the coordinated enforcement posture documented herein, Plaintiff's business income was reduced to zero from May 2025 through the present date of filing. At a conservative estimate of $150,000 per year in pre-enforcement business income, ten months of total income destruction (May 2025–March 2026) represents approximately $125,000 in documented economic loss,  Plaintiff's opposing party in the parallel family court proceedings earns approximately $1,300,000 annually; the enforcement-campaign-created income disparity is an independent element of economic harm in the pending support proceedings directly caused by the constitutional violations alleged herein.  (b) Criminal Defense Costs and Bail: Three arrests across three criminal cases have required Plaintiff to navigate legal proceedings including bail costs. Plaintiff paid $25,000 bail documented in discharge record DC#: 25-26-

068366 (Exhibit BB). Criminal defense costs are ongoing across Cases MC-51-CR-0015343-2025, MC-51-CR-0000640-2026, and MC-51-CR-0001972-2026. The unauthorized February 2, 2026 Joint Continuance Request filed without Plaintiff's consent generated additional contested tolling and scheduling prejudice. (c) Parental Separation — Children with Documented Special Needs and Documented Ongoing Harm: The fraudulently predicated PFA and contempt arrest chain stripped Plaintiff of meaningful parental access and eliminated his ability as the protective parent to intervene in documented ongoing harm to his children. Plaintiff's access was reduced to ten hours per week by the February 20, 2025 emergency hearing order — a hearing at which Plaintiff was not permitted to present in person and was forced to participate by phone in a snowstorm (July 14, 2025 Certified Transcript, pp. 148–149 — Tier A). No court, across four transcripts, cited one valid specific instance of harm, neglect, or abuse by Plaintiff. The access restriction has continued through the present date, with no overnight visits, no Father's Day access, and documented instances of appointments cancelled by opposing party to prevent Plaintiff from seeing children on his birthday. Calvin Ferrari (d.o.b. November 13, 2020) has a cochlear implant requiring coordinated medical management. Plaintiff was removed from Calvin's CHOP medical records by opposing party, documented in her own email of June 10, 2025. Plaintiff has been excluded from Calvin's hearing appointments, cochlear implant activation scheduling, and care team communications during a critical developmental window. The coordinated enforcement campaign that stripped Plaintiff of parental access has simultaneously stripped Calvin of his father's participation in medical decisions that require both parents for optimal outcomes. At the June 18, 2025 certified hearing (Transcript pp. 8–12 — Tier A), Plaintiff documented that Calvin had an untreated facial lesion of seven months' duration and Caia had an untreated lesion on her hip of equivalent duration. Plaintiff had taken the children to pediatric urgent care on June 16, 2025, where the treating provider documented the untreated conditions and recommended reporting to Child Protective Services (Pediatric Urgent Care record, June 16, 2025 — Tier B). Opposing party denied both conditions required treatment at the hearing. Plaintiff has been unable as the protective parent to advocate for the children's medical welfare because the enforcement campaign eliminated his access and parental decision-making rights. Caia Ferrari (d.o.b. October 29, 2022) has expressed on video, in uncoached statements, documented fear of her maternal grandfather Jay Abovitz. Plaintiff formally notified opposing party of these concerns on June 5, 2025 and requested a forensic psychological evaluation (OurFamilyWizard correspondence — Tier B). Opposing party refused. Jay Abovitz has been documented engaging in reckless driving with the children as passengers. The enforcement campaign's elimination of Plaintiff's parental access prevented him from addressing documented ongoing harm to Caia. Parental separation damages are ongoing and will be established at trial. (d) Housing Instability and Loss of Safe Living Environment: The enforcement campaign and coordinated Williamson conduct directly caused Plaintiff's housing instability. Plaintiff was ejected from the marital residence at 924 New Market Street, Philadelphia, through a Blank Rome-filed exclusive possession petition on November 22, 2024. He relocated to 1119 Wallace Street where he was subjected to: a coordinated forced police entry on January 10, 2026 with door kicked in and physical assault; a March 3, 2026 lockout without court order (Garcia TRO issued March 11, 2026 confirming illegal lockout); theft of personal belongings; and ongoing landlord

retaliation coordinated with the judicial network. The combination of ejection from the marital residence, retaliation at the rental, and three arrests created a period of housing instability directly caused by the constitutional violations. Loss of stable housing while managing three criminal cases, a federal complaint, and a custody battle is compensable as consequential damages. (e) Reputational Collapse — Professional and Industry Standing: Three public arrests on charges whose probable-cause predicates are documented as false or void have permanently damaged Plaintiff's professional reputation in his industry. The arrests are public record. The criminal dockets are searchable. Every professional relationship, business development opportunity, and industry credibility metric was impacted by three arrests in a seven-month period. Reputational damages in §1983 civil rights actions with documented false-arrest predicates routinely exceed $100,000 where the plaintiff has a documented professional history. (f) Emotional Distress — Clinically Documented Across Multiple Providers: Plaintiff has received ongoing psychiatric and medical treatment for conditions arising from and exacerbated by the enforcement campaign, documented in clinical records from Dr. McFadden (treating psychiatrist), Dr. Haimovich, and Dr. Pierre Kory. The trauma history is documented in a ranked psychological impact assessment covering events from 2022 through 2025, with parental alienation and business destruction ranked at the highest severity levels. Emotional distress from three wrongful arrests, family separation from two minor children including one with special medical needs, sustained enforcement pressure, housing instability, and inability to rebuild business while the enforcement apparatus remained active is clinically supported and independently compensable. Emotional distress damages in §1983 civil rights actions with documented clinical support routinely exceed $100,000. (g) Physical Harm — Forced Entry and CFCF Release Conditions: On January 10, 2026, Plaintiff was physically choke-slammed against a wall and thrown during the coordinated forced entry by Philadelphia police and Sheriff's deputies. No use-of-force report was filed. The physical assault during a documented retaliatory arrest is independently compensable as excessive force. Additionally, upon release from the Curran-Fromhold Correctional Facility (CFCF), Plaintiff was subjected to the following documented conditions directly resulting from the retaliatory detention: (i) Plaintiff's personal belongings were withheld past his release time and not returned until 8:00 AM the following day, leaving him without his property at release; (ii) Plaintiff was physically assaulted (shoved) by another inmate during the release process while CFCF corrections officers observed and took no action — a documented failure-to-protect; (iii) Without a phone — the phone having been seized and not returned as documented throughout this complaint — Plaintiff was unable to contact his ride and requested permission to wait safely inside the CFCF facility; CFCF staff refused, required Plaintiff to board a transport van, and upon drop-off required Plaintiff to cross the street to a bus stop alone, at night, without a phone, in the company of two individuals from the transport who had been making verbal threats; (iv) Plaintiff refused to cross the street and, after asserting his right to remain at a safe distance inside the facility exit, was ultimately permitted to wait approximately ten feet inside the CFCF exit until his ride arrived. These release conditions — property withholding, failure to protect from physical assault, and forced exposure to threatening individuals without phone access — are consequential damages flowing directly from the retaliatory arrest that caused Plaintiff's detention. Had the January 10, 2026 arrest not been executed in the retaliatory manner

documented in Counts III and VII, none of these release-condition harms would have occurred. Plaintiff has not previously filed any complaint regarding these CFCF release conditions; this is the first documented account of the incident. The specific CFCF officers involved are identified as Does defendants subject to identification through discovery and the CFCF video surveillance and release records for the relevant date. (h) Parental Separation and Special-Needs Child Harm: Plaintiff's three periods of wrongful detention directly disrupted his coordination of specialized medical care for Calvin Ferrari (d.o.b. October 29, 2022), who requires bilateral cochlear implant management and two-parent medical communication — constituting independently compensable harm to a minor with documented special needs, caused directly by the constitutional violations alleged herein. (h-1) Elder Abuse of Plaintiff's Mother Patricia Ferrari — Consequential Damages: As a direct and proximate result of the Williamson coordination documented in Count VII, Plaintiff's elderly mother Patricia Ferrari suffered documented elder abuse at the hands of Richard Williamson. Between January 10–12, 2026, Williamson abused Patricia, attempted to lock her out of the property, and stole Plaintiff's belongings after she was forced to leave. Dean Weisgold, Williamson's attorney, pre-teased the property theft to Patricia in writing before the arrest — documented in correspondence (Exhibit W, Tier B). Williamson also communicated directly with Julie Ferrari regarding Plaintiff's rent status, as confirmed when Julie contacted Patricia asking about Plaintiff's rent in early December 2025 — information only Williamson could have provided to Julie. Plaintiff's mother is elderly and the documented abuse, financial threats, and property theft caused her significant distress and required Plaintiff to devote substantial time, attention, and resources to ensuring her safety and wellbeing during a period when Plaintiff was simultaneously managing three criminal cases, a federal complaint, and a custody battle. The time, emotional burden, and resources diverted to protecting and caring for Patricia Ferrari as a direct consequence of Williamson's coordinated conduct constitute compensable consequential damages under Count VII. Additionally, Plaintiff has been separated from his mother during a period of serious health decline — documented in Plaintiff's own ranked trauma assessment as one of the most severe concurrent stressors of this period — as a direct result of the enforcement campaign that stripped him of stable housing, income, and freedom. The loss of time with an elderly ill parent during critical months, directly caused by constitutional violations, is an independently compensable non-economic injury. (i) Property Destruction and Seizure: Plaintiff's cell phone was seized June 18, 2025 at the Sulman hearing and has never been returned. Nineteen iMessages are permanently missing, deleted from law-enforcement custody on the Thursday night before the July 14, 2025 hearing. Personal belongings were removed from Plaintiff's residence at 1119 Wallace Street during the coordinated property-access events of January 10–12, 2026. The phone itself, its forensic integrity, and the 19 missing iMessages represent documented property and evidentiary loss with compounding harm to Plaintiff's ability to defend three active criminal cases. (j) Punitive Damages: Defendants Leonard, Killman, Johnson, Zakeosian, Corrigan, and Williamson each acted with deliberate or reckless disregard for Plaintiff's clearly established constitutional rights — documented by Leonard's audio admission, Leonard's 33-day notice of the false probable-cause basis, Zakeosian's same-day escalation response to whistleblower assertion, Johnson's documented courtroom removal, and Williamson's documented advance knowledge of judicial action before the resulting warrant

existed. Smith v. Wade, 461 U.S. 30 (1983). At the low end of the punitive multiplier range for documented deliberate civil rights violations (3x–5x compensatory), total punitive exposure against named individual defendants is at least $1,000,000. (k) Aggregate Damages Summary: Plaintiff's documented economic and non-economic losses include: lost income since May 2025; reputational and professional harm; housing instability and property loss; physical assault during arrest; and clinically documented emotional distress. Each constitutes an independent compensable category. With punitive damages against named individual defendants, total exposure exceeds $2,500,000 — supported by government-generated records, certified court transcripts, clinical treatment records, and authenticated financial data to be produced in discovery.

71.    AWARD compensatory damages for: (a) three wrongful arrests and periods of detention; (b) warrantless phone search and data destruction; (c) Brady suppression and resulting prejudice; (d) income loss since May 2025; (e) property destroyed or stolen; (f) emotional distress; and (g) attorneys' fees under 42 U.S.C. § 1988.

72.    AWARD punitive damages against individual defendants — including Detective Leonard, Officer Killman, Lt. Johnson, ADA Zakeosian, and ADA Corrigan, in their individual capacities — in amounts sufficient to deter future constitutional violations, given the documented pattern of deliberate and reckless disregard for clearly established rights. The City of Philadelphia cannot insulate individual actors from personal punitive exposure where, as here, the violations alleged are malicious or exhibit reckless indifference to federally protected rights. Smith v. Wade, 461 U.S. 30 (1983).

73.    GRANT any other equitable relief this Court deems just and proper, consistent with non-interference in ongoing state criminal proceedings.

---

## VERIFICATION

I, Chad Mark Franco Ferrari, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief. All Tier A allegations are based on certified transcripts, docket entries, and the Commonwealth's own institutional filings. All Tier B allegations are based on authenticated business records or public documents. Where allegations are stated on information and belief, I have a good-faith factual basis for each such allegation.

Executed at Philadelphia, Pennsylvania, on March 23, 2026.

_____  3/23/26

CHAD MARK FRANCO FERRARI, Pro Se

1119 Wallace Street, 1st Floor, Philadelphia, PA 19123 chadferrari@me.com

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, I served a copy of this complaint on all defendants at the following addresses via first-class mail and/or electronic service where available:

Philadelphia Police Department, Legal Affairs Unit, 750 Race St., Philadelphia, PA 19106
Philadelphia District Attorney's Office, Three South Penn Square, Philadelphia, PA 19107
Philadelphia Sheriff's Office, 100 S. Broad Street, Philadelphia, PA 19110 (Attn: Sheriff Bilal)
City of Philadelphia Law Department, 1515 Arch St., Philadelphia, PA 19102
Richard Williamson, c/o Dean E. Weisgold, Esq. (address to be confirmed and served)

# FERRARI v. LEONARD et al. — CASE SUMMARY FOR COURT

*Track 2 of 5 | 42 U.S.C. § 1983 | EDPA | Filed March 23, 2026*

Pro Se: Chad Mark Franco Ferrari | 1119 Wallace Street, 1st Floor, Philadelphia, PA 19123 | chadferrari@me.com

## WHAT THIS CASE IS — AND WHAT IT IS NOT

| WHAT THIS CASE IS | WHAT THIS CASE IS NOT |
|---|---|
| A completed Fourth Amendment violation: phone searched before warrant — admitted on officer's own audio recording | A request to review or vacate any state-court ruling — all injuries are completed executive-branch acts independent of any state adjudication |
| Three arrests on a PFA whose fraudulent purpose was admitted on certified transcript by the petitioner's own attorney | A claim requiring this Court to review or disturb any pending family court order |
| 20-day Brady suppression of DA's own filing naming the presiding judge as a material witness — disclosed minutes before third arrest | A request to interfere with a pending state adjudication — relief sought targets completed enforcement acts by executive-branch defendants only |
| Five-step government surveillance-to-prosecution pipeline documented across four certified Tier A transcripts | The core anchors are certified transcripts, dockets, and the government's own filings |

## FIVE CONSTITUTIONAL ANCHORS — EACH INDEPENDENTLY SUFFICIENT

| # | Anchor | Core Fact | Evidence Tier |
|---|---|---|---|
| A | **Pre-Warrant Phone Search** | Leonard admitted on audio he searched phone before warrant — Riley v. California, per se violation | *Tier C audio — Exhibit H (chain of custody pending)* |
| B | **Three Arrests on Void Predicate** | PFA admitted on certified transcript to have been filed for residential possession — Fanning (signing judge) arrested March 10 for identical conduct PFA purported to address | *Tier A — Wahl transcript p.15 + news records (Exhibit C, R)* |
| C | **20-Day Brady Suppression** | DA's own January 13 filing naming Sulman as material witness suppressed 20 days — disclosed minutes before third arrest — three attorneys, one suppressed document | *Tier A — DA Certification of Service (Exhibit K)* |
| D | **Surveillance → Recording → Prosecution Pipeline** | FJD court recorder Segulin monitored Chad's Instagram before hearings — Chad recorded to protect record — phone seized — arrest 62 days later — Sulman later recused and named as DA material witness | *Tier A — four certified transcripts (Exhibits L-1, L-2, L-3, U)* |
| E | **Papademetriou Family Prosecutorial Conflict** | Judge who issued predicate order has daughter as ADA in Family Violence Unit — same unit prosecuting Chad — never disclosed | *Tier A — NYT wedding announcement (Exhibit S-1) + phillyda.org (Exhibit S-3)* |

## THREE RETALIATORY ENFORCEMENT CIRCUITS — EACH SELF-SUFFICIENT

| Circuit | Protected Activity → Enforcement | Key Exhibit | Case |
|---|---|---|---|
| A (Aug 19, 2025) | Segulin gov't surveillance → protective recording → phone seizure → warrant on false premise (no sign posted — Sulman confirmed) → Leonard arrest 62 days later | *Exhibit H (Leonard audio) + Exhibit U (Sulman on record, no sign)* | -0015343 |
| B (Jan 10, 2026) | Chad boos Krasner at Jan. 5 inauguration → Krasner FAFO post + 'Trump can't pardon state conviction' Jan. 8-9 → defective-notice bench warrant Jan. 8 → Killman/Davis arrest Jan. 10 | *Exhibits KRASNER-1, KRASNER-2, X (Instagram) + Williamson 'we will be coming in' Jan. 8* | -0640 |
| C (Feb 2, 2026) | Brady disclosure in hallway → 5 min. later arrest on same predicate communication as Circuit B → Room 406 void proceeding March 2 → Brian Johnson unauthorized appearance, presence waived without consent | *Exhibit K (DA Certification) + Exhibit V (Kearney 'no Teams record')* | -0001972 |

## THE FIVE FACTS THAT REQUIRE NO INFERENCE

| # | Fact — No Inference Required | Source |
|---|---|---|
| 1 | Leonard: searched phone before warrant — his own words | *Exhibit H — Leonard audio (Tier C)* |
| 2 | Vidas: PFA filed for residential possession, not protection — her own words | *Exhibit C — Wahl transcript p.15 (Tier A)* |
| 3 | Krasner: 'Trump cannot pardon a state court conviction' — Jan. 8, 2 days before arrest | *Exhibit KRASNER-2 — Billy Penn (Tier A)* |
| 4 | DA Corrigan: named Sulman as material witness in same case Sulman was presiding over | *Exhibit K — DA Certification of Service (Tier A)* |
| 5 | Kearney: 'We definitely don't handle anything on Teams' — confirming void Room 406 proceeding in writing | *Exhibit V — Kearney email March 3, 2026 (Tier A)* |

## RELIEF REQUESTED — EIGHT COUNTS

| Count | Claim | Defendants |
|---|---|---|
| I | Fourth Amendment — Warrantless Phone Search (Riley) | Leonard, City |

| II | Fourth Amendment — False Arrest x3 (Void Predicate / Franks) | Leonard, Killman, Davis, Corrigan |
|---|---|---|
| III | First Amendment — Retaliatory Prosecution / Viewpoint Discrimination | Leonard, Killman, Zakeosian, Krasner, Bilal |
| IV | Fourteenth Amendment — Brady Suppression (20 days) | Corrigan, Zakeosian, Krasner |
| V | Giglio / Brady — Prosecutorial Conflict Non-Disclosure (Papademetriou family) | Corrigan, Zakeosian, Krasner |
| VI | Monell — Municipal Liability (City of Philadelphia) | City, Krasner (official capacity), Bilal |
| VII | § 1983 Conspiracy — Private State Actor (Williamson) | Williamson + coordination defendants |
| VIII | Evidence Destruction — Trombetta/Youngblood (19 missing iMessages) | Leonard, City |

## RELIEF REQUESTED — EIGHT COUNTS

**RELIEF: Substantial compensatory and punitive damages against individual defendants, documented across government records, certified transcripts, clinical records, and authenticated financial data.**

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Ferrari v. Leonard et al. | 42 U.S.C. § 1983 | Exhibit Binders — Evidentiary Tier Explanation

## EXHIBIT ORGANIZATION — THREE-BINDER EVIDENTIARY TIER SYSTEM

Plaintiff has organized exhibits across three binders corresponding to evidentiary reliability tiers. Each tier reflects the foundation required for admission and the standard applicable at the pleading stage under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and applicable Federal Rules of Evidence.

| BINDER | TIER | WHAT IT IS | ADMISSION FOUNDATION |
|---|---|---|---|
| BINDER 1 | TIER A *Certified / Government* | Certified court transcripts, official docket entries, DA institutional filings, and public records. Each is self-authenticating under Fed. R. Evid. 901 and/or subject to judicial notice under Fed. R. Evid. 201(b)(2). No foundation witness required at the pleading stage. | Admissible without additional foundation. No Tier A claim in the complaint requires the Court to accept any unverified allegation. |
| BINDER 2 | TIER B *Authenticated Records* | Authenticated business records, timestamped platform data (emails, text messages, social media), investigative records, and public documents verifiable through independent sources. Include screenshots, emails with authenticated headers, and news records. | Require supporting sworn affidavit or business records certification for trial admission. Cited at pleading stage as supporting the plausibility of inferences under Iqbal. |
| BINDER 3 | TIER C *Audio / Pending Certification* | Audio recordings requiring forensic chain-of-custody certification before trial admission. Content of each Tier C recording is independently corroborated by Tier A certified transcripts. Chain-of-custody certification to be produced in discovery. | Cited at pleading stage as corroborative context only. No count in this complaint depends solely on Tier C evidence. Each Tier C recording has parallel Tier A corroboration identified in the complaint. |

**PLEADING STANDARD NOTE:** At the 12(b)(6) stage, the Court takes well-pleaded facts as true. Tier A evidence is offered to demonstrate that the core factual allegations are not merely conclusory but are grounded in certified transcripts, docket entries, and the government's own institutional filings — each independently verifiable today without any credibility determination.

**TIER A EXHIBITS (Binder 1):** Exhibit C (Wahl Transcript p.15), Exhibit K (DA Motion / Corrigan Cert.), Exhibit L-1 (July 17 Transcript pp.18-19), Exhibit L-2 (Sept. 22 Transcript pp.17-24), Exhibit U (June 18 Transcript pp.54-55, 61-63), Criminal Dockets (3), McFadden Billing Records, December 24, 2024 PFA Petition (Fanning), January 3, 2025 Stipulation, Sulman Self-Assignment Document.

**TIER B EXHIBITS (Binder 2):** Exhibits L-4, W, X, Y-1, Y-2, Y-5, Y-6, KRASNER-1, KRASNER-2, KRASNER-3, Z-3, Z-5.

**TIER C EXHIBITS (Binder 3):** Exhibits H (Leonard Audio), J (Yee Audio), Goldstein Tape. Each corroborated by Tier A citation identified in the complaint.

Chad Mark Franco Ferrari | Pro Se Plaintiff | 1119 Wallace Street, 1st Floor, Philadelphia, PA 19123 | chadferrari@me.com
*Ferrari v. Leonard et al. | Track 2 of 5 | 42 U.S.C. § 1983 | Eastern District of Pennsylvania | Filed: March 24, 2026*